DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 1

1        IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF MARYLAND
3   ANTHONY GRAY                    *
4        Plaintiff,                 *
5            vs.                    *   Case No. CCB-02-CV-385
6   STATE OF MARYLAND, et al.       *
7        Defendants.                *
8   *    *    *    *    *    *    *    *    *    *    *
9            Pursuant to Notice the deposition of
10  LAWRENCE STINNETT, was taken on Tuesday, April 8,
11  2003, commencing at 1:00 p.m., at the law offices of
12  Joel L. Katz, 2060 West Street, Annapolis, Maryland,
13  21401, before Ann D. Agee, RPR, Notary Public.
14  APPEARANCES:
15              JOEL L. KATZ, ESQUIRE
                2060 West Street
16              Annapolis, Maryland,  21401
                (On behalf of the Plaintiff)
17
                KEVIN KARPINSKI, ESQUIRE
18              ALLEN, KARPINSKI, BRYANT & KARP
                100 E. Pratt Street, Suite 1540
19              Baltimore, Maryland,  21202
                (On behalf of the Defendant,
20              Lawrence Stinnett)
21

EXHIBIT
D

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 3

1               P-R-O-C-E-E-D-I-N-G-S

2   Whereupon,

3               LAWRENCE STINNETT,

4   the Witness herein, having been duly sworn, testified

5   as follows:

6          EXAMINATION BY ATTORNEY FOR THE PLAINTIFF

7               BY MR. KATZ:

8          Q.   Can you please state your name and

9   address for the record.

10         A.   Lawrence Stinnett, 4015 Leitches Wharf

11  Road, Prince Frederick, Maryland.

12         Q.   You live down there by the wharf

13  itself?

14         A.   I live about -- I am the second house

15  on the right past Mallow Point Road.

16         Q.   How far are you from the water?

17         A.   From Thomas?

18         Q.   Yes.

19         A.   Probably about a mile, three-quarters

20  of a mile.

21         Q.   How long have you lived there?

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 22

1  her a friend of mine?

2           A.   I don't have any knowledge of it.

3           Q.   Now directing your attention to the
4  Pellicano murder case, would you agree that that was a
5  very newsworthy situation?

6           A.   I was aware it was a very heinous
7  crime, probably one of the worst that had ever
8  happened in Calvert County.

9           Q.   That was in all the newspapers front
10 page?

11          A.   Yes.  Yes.

12          Q.   Can we agree that you were involved in
13 initial investigation with Brian Newcomer?

14          A.   I assisted Brian in taking a statement
15 from Anthony Gray.

16          Q.   Prior to taking a statement from
17 Anthony Gray what was your involvement in the case?

18          A.   I was invited to the barracks when
19 they had periodic meetings about the case.

20          Q.   How often were you invited to the
21 barracks?  It happened on August 13th, did it not?

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 23

1               MR. KARPINSKI:  Objection.  August

2  13th?  You mean May 13th.

3          A.   Yes.

4               BY MR. KATZ:

5          Q.   May 13th.  I'm sorry.  You are

6  absolutely right and Anthony was picked up June 20th.

7          A.   Right.

8          Q.   So from between May 13th up until June

9  20th do you recall or do you remember how many

10 meetings you had at the state police barracks?

11         A.   No.

12         Q.   Was it more than one?

13         A.   Yes.

14         Q.   Was it more than three?

15         A.   I don't know.

16         Q.   Do you remember prior to coming in

17 here today did you have an opportunity to review

18 Newcomer or Sheldon's testimony with anybody?

19         A.   No.

20         Q.   You didn't review it with your

21 attorney?

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 33

1    Q.   Did you inquire from him what time he
2 got up on that day?

3    A.   No.

4    Q.   At what time did your interrogation
5 begin?

6    A.   I would say the first one was when we
7 got to the barracks. He was picked up at 6 o'clock
8 and we talked to him briefly; maybe a half hour.

9    Q.   Half hour?

10   A.   Yes.

11   Q.   Then where was he put?

12   A.   He was put back in the holding cell
13 downstairs and we called for a polygraph operator.

14   Q.   Who was the polygraph operator you
15 called?

16   A.   Corporal Williams.

17   Q.   Taking a polygraph was that something
18 he could elect to do or decline?

19   A.   Yes.

20   Q.   Did he elect to take the polygraph?

21   A.   Yes.

1        Q.   What were the results of the
2   polygraph?
3        A.   Corporal Weems came up and told
4   Newcomer and I that he had failed the test and he
5   thought he was ready to tell us what we wanted to
6   know.
7        Q.   Did you actually see the sheet?
8        A.   Last week was the first time I seen
9   it.
10       Q.   What did the sheet say to you?
11       A.   His readings weren't good enough to --
12       Q.   They were inconclusive?
13       A.   Right.
14       Q.   So that would indicate he could be
15   lying or he could be telling the truth?
16       A.   That is not what he told us.
17       Q.   So you are saying that the polygraph
18   operator misled you as to the results; is that what
19   you are saying?
20            MR. KARPINSKI:  Objection.
21       A.   No, I didn't say that.

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 35

1      BY MR. KATZ:

2      Q.   Well, if --

3      A.   I said he came out and told us that he
4  thought he was lying and that he thought he was ready
5  to give us a statement.

6      Q.   But if the sheet says that it was
7  inconclusive, the official sheet he filled out, there
8  seems to be a in derogation in what he said and what
9  the sheet said; would you agree with that?

10     A.   I was surprised last Thursday when he
11 said that.  Probably the first time I saw it and
12 probably the first time Newcomer saw it, because when
13 he comes in he gives -- he goes into the secretary who
14 sticks it into a file and that is it.

15     Q.   I see.  As a result of what the
16 polygraph operator said what did you all do?  What did
17 you do?

18     A.   Well, I think Greg Cameron, Sergeant
19 Cameron -- he's a sergeant now -- Greg Cameron and
20 Newcomer started talking to him again; interviewing
21 him again.

Page 36

1   Q.   You were there with him?

2   A.   I wasn't in the room with them at that
3   time, no.

4   Q.   Tell me the times you were in the room
5   with --

6   A.   I went with Newcomer to pick him up.
7   On the way over I told Newcomer I said, damn, I hope
8   this boy is not involved because his grandfather just
9   got finished working at the poles for me at Mt. Hope
10  School.  He wore my sweatshirt and he wore my hat.

11           I said I have known his grandmother
12  and grandfather for 40 years -- Major Gray -- and he
13  worked for the state road all those 40 years and every
14  Friday night he would come into the A&P where I worked
15  part-time and I knew his father, Kermit Gray, who when
16  I wanted to know something going on in the Bayside
17  area I could go see Kermit Gray.  Kermit had died and
18  past away at that time.  I said, boy, I hope he is not
19  involved.

20           When we brought him back to the
21  barrack and we started questioning him I said, let's

1  call Corporal Williams in on a polygraph to make sure
2  before we go any farther with this.  Let's don't piss
3  him off before we know the truth.
4              Corporal Williams was African American
5  and we brought him in from Waldorf.  It took him about
6  two hours to get there from Waldorf, approximately.
7  Then it took him about two or three hours with Anthony
8  Gray.
9              Coming in from his house I asked him,
10 how is your grandfather doing, Anthony.  You know my
11 grandfather?  Yes, he worked at the poles for me.  We
12 got to the barrack and we talked to him about a half
13 an hour.
14              We put him back into the cell until
15 Pete Williams got there.  Then when they took him out
16 Cameron and Newcomer talked to him maybe an hour.  I
17 don't know how long.  Maybe an hour or two.  But
18 Cameron comes out and said, Bootsie, I think -- I
19 don't think it was that long because it seemed like to
20 me it didn't take long for him to decide he was going
21 to tell us what happened.

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 38

1      Q.   Then what happened?

2      A.   Then I went in and Newcomer and I
3 talked to him some more and basically what I said, I
4 said, you know, Anthony, you wouldn't be here if it
5 wasn't for your first cousin, Paul Holland, who named
6 you because we never heard of you before, and Leonard
7 Long who said that it looked like your handwriting on
8 the checks.

9      You know, the crime lab came down and
10 they processed the house, processed the car.  There is
11 a chance your fingerprints may be in either one of
12 those if you were in either one of those places.

13      It wasn't too much longer he -- I
14 didn't go in the house.  I was a lookout.  I waited in
15 the woods.

16      Q.   Actually did you tell him the crime
17 lab found his fingerprints there?

18      A.   No.  Never told him that.

19      Q.   Didn't you on at least five different
20 occasions describe what it was like to be
21 electrocuted?

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 39

1      A.   No, that's not true.

2      Q.   Didn't you tell him you were looking

3  out for him because you know his family so well?

4      A.   No.

5      Q.   And you didn't want to see anything

6  happen to him?

7      A.   No.

8      Q.   How long did you know Anthony?

9      A.   Never heard of him before until Long

10 said it looked like his handwriting on the checks.

11     Q.   You knew his father and his

12 grandfather but you didn't know about him?

13     A.   No.  I knew he had a brother named

14 Kermit who was getting in trouble but I never heard of

15 Anthony.

16     Q.   Now when you picked him up, you ran a

17 sheet on him, didn't you, to see if he had any prior

18 record?

19     A.   I don't know whether Newcomer went

20 upstairs and checked or not.

21     Q.   So we're now getting to him giving you

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 43

1  sleep?

2          A.   I don't even think he was

3  interrogated.  He was interviewed basically.  Very low

4  key.

5          Q.   Very low key?

6          A.   Yes.

7          Q.   That was by you and Newcomer?

8          A.   Yes, sir.  I don't know what happened

9  when I wasn't in the room.

10         Q.   So there are periods of time when you

11 weren't in the room when he was being interrogated by

12 Newcomer?

13         A.   And Greg Cameron.

14         Q.   Where were you at those times?

15         A.   Roaming around the barracks.

16         Q.   So there were times he was

17 interrogated.  You might not know the total length of

18 time; is that correct?

19         A.   Not the exact hour; not the exact

20 minute.

21         Q.   So there was interrogation by you, and

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 44

1   interrogation with you and Newcomer, and interrogation

2   with Newcomer and Cameron?

3           A.   Yes.

4           Q.   Then two hours with the polygraph

5   operator.  What is the total period of time you

6   interrogated him?

7           A.   I would say maybe half an hour when he

8   was initially picked up, and maybe half an hour before

9   he gave the taped statement.

10          Q.   Do you have personal knowledge the

11  total time Newcomer interrogated him?  I don't want

12  you guessing.

13          A.   I can't guess the exact minute or --

14          Q.   Hour or two hours?

15          A.   I would say -- well, you can figure

16  from 6:00 to 10:00, two hours of that time he was

17  sitting in a cell waiting for the polygraph operator

18  to come.  Then he spent between two and three hours

19  with the polygraph operator.  The rest of the time you

20  can figure somebody was talking to him.  So if you

21  want to figure the two hours and three hours is five

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 45

1  hours. Whatever.

2      Q.   Was he advised of his rights?

3      A.   He was advised of his rights initially
4  by Trooper Newcomer from the car.

5      Q.   Were you there?

6      A.   The first time, yes, when we first
7  picked him up.

8      Q.   You were there for the statement,
9  correct.

10     A.   Yes, sir.

11     Q.   Was he advised again?

12     A.   Again, no, sir.

13     Q.   Wasn't advised again?

14     A.   No.

15     Q.   Did he ever sign a waiver under
16 Miranda?

17     A.   He may have signed one for Corporal
18 Williams.

19     Q.   That was for the polygraph?

20     A.   Right. They get them to sign a waiver
21 when they do pretesting for a retesting interview.

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 47

1  A. Right.

2  Q. In fact, there's actually no signature
3  on here by Anthony Gray at all; is that correct?

4  A. Right.

5  Q. Now you said you were present when
6  Newcomer advised Anthony of his rights?

7  A. When we first picked him up.

8  Q. Would you describe what happened with
9  those; with the advice?

10 A. He read them from the card and after
11 each question he asked him did he understand.

12 Q. What did Anthony say?

13 A. Yes.

14 Q. Yes, or did she just shake his head?

15 A. Yes.

16 Q. He said yes?

17 A. He acknowledged he understood. He
18 answered. If he hadn't answered we would have asked
19 him to answer.

20 Q. I see. What was your involvement in
21 the case after this?

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 48

1         A.   Nothing.

2         Q.   Did you do any more additional
3    interrogation?

4         A.   No.

5         Q.   As sheriff was the jail under your
6    domain?

7         A.   Yes.

8         Q.   You were the head man?

9         A.   Yes.

10        Q.   What arrangements were made with
11   regard to Anthony during the period of time from June
12   21st until August the 6th with regard to his place in
13   the jail in relationship to the general population?  I
14   think it is simple.  Was he segregated?

15        A.   I don't think so.

16        Q.   Was he kept away from Long and kept
17   away from Holland?

18        A.   I think so.

19        Q.   Did you have any involvement in the
20   case after the June 21st statement?

21        A.   No.  Not that I recall, no.

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 49

1        Q.    You didn't do any additional
2  interrogation?
3        A.    I may have assisted Newcomer in
4  talking to Holland again.
5        Q.    In regard to Anthony Gray?
6        A.    No.
7        Q.    Were you aware of a letter that Warren
8  Sengstack, the then state's attorney, received from a
9  guy name Fleming?
10       A.    No, nothing until -- no, not at that
11  time.
12       Q.    When did you first become aware of it?
13       A.    I first became aware Warren received
14  one last Thursday. I knew, I heard Fleming had been
15  writing the state's attorney's office, but I never
16  knew he wrote one to Warren Sengstack.
17       Q.    Newcomer never told you back during
18  the course the investigation about that letter?
19       A.    No. This investigation would have
20  long been over when that occurred I would think.
21  Fleming didn't start writing until this case was over

Page 51

1   Sengstack received the first letter from Fleming?

2       A.   No.

3       Q.   Now it was your position as sheriff of

4   Calvert County back then as well as a state trooper to

5   make sure the law is upheld. Can we agree on that?

6       A.   Yes.

7       Q.   It is also your position as sheriff

8   that if an innocent man is wrongfully convicted you

9   would do everything to make sure that justice prevails

10  as sheriff to set aside that wrongful conviction.

11          MR. KARPINSKI:  Objection.

12      A.   Yes.

13          BY MR. KATZ:

14      Q.   Can we agree?

15      A.   Yes.

16      Q.   You consider that as much a

17  responsibility as actually --

18      A.   I would think it would be a terrible

19  crime if an innocent person went to jail.

20      Q.   Okay. Let's go through this case a

21  second. Were you aware of alibi witnesses on behalf

DEPOSITION OF LAWRENCE STINNETT
TAKEN ON APRIL 8, 2003

Page 52

1   of any of the three defendants?

2           A.   I was aware of the three that you

3   talked about last week; last Thursday.

4           Q.   Which three?

5           A.   The three that worked on the trash

6   truck with Wardell Holland.

7           Q.   What was your understanding with

8   regard to their being alibi witnesses?

9           A.   Of course they alibied for -- Paul

10  Holland was on the trash truck with him and couldn't

11  have been involved, and Wardell was his father, and

12  the rest of them were Wardell's employees; Snappy

13  Grose and Chester Pinkney.  They were interviewed.

14          Q.   But you can believe them?

15          A.   I didn't interview them.

16          Q.   But you didn't believe them.  Just

17  listening to you now it seems you figured they were

18  biased?

19               MR. KARPINSKI:  Objection.

20               BY MR. KATZ:

21          Q.   Is that a fair statement?