| CALVERT COUNTY SHERIFF'S OFFICE | SUPPLEMENT | 1. COMPLAINT CONTROL NO. MSD-06173 |
|---|---|---|
| 2. OFFENSE/INCIDENT BREAKING, ENTERING & THEFT | 3. VICTIM/FIRM NAME  LAST, FIRST, MIDDLE FAMILY AFFAIR RESTAURANT | 4. DATE-ORIGINAL REPORT 5/19/91 |
| SUPPLEMENT STATUS: CON'T. ☐ FOLLOW-UP ☐ | 5. IF MULTIPLE CLEARANCE, LIST C.C. NUMBERS | |

**27-1. SUSPECT ONE:** ARRESTED YES ☐ NO ☐   WEAPON-DESCRIPTION
NAME (LAST, FIRST, MIDDLE): HOLLAND, Paul Marcello   ALIAS:
ADDRESS: 5681 Old Bayside Rd., Ches. Beach, MD   PHONE:
SEX: M   RACE: B   DOB OR AGE: 59   HT: 510   WT: 175   BLD: med   EYES: bro   COMP: drk   HAIR & STYLE: blk
CLOTHING - CHARACTERISTICS:
MISCELLANEOUS: SSN: ***-**-4655

**27-2. SUSPECT TWO:** ARRESTED YES ☐ NO ☐   WEAPON-DESCRIPTION

**NARRATIVE:** DO NOT REPEAT RESULTS OF PRELIMINARY INVESTIGATION. CLARIFY DATA, SCREENING FACTORS, PROBABLE CAUSE, ETC. ENTER ANY ADDITIONAL INFORMATION. DO NOT SUMMARIZE UNLESS NECESSARY.

On June 19, 1991 the suspect was formally charged with this offense. The investigator in this case is Detective W.C. Soper of the Calvert County Sheriff's Office. I was present at the time and notified the Maryland State Police (TFC B.C. Newcomer) that he was in custody.

It had been decided before hand that when Holland was arrested for the Breaking & Entering, he would be questioned about the Pellicano murder. This supplement report being submitted by me is to document my involvement in the homicide investigation.

EXHIBIT E

I.D. Number: 8033   Date: 8/19/91

```
CALVERT COUNTY                          COMPLAINT CONTROL NO.
SHERIFF'S OFFICE                        MSD-06173
```

VICTIM:   FAMILY AFFAIR RESTAURANT

INCIDENT: BREAKING, ENTERING & THEFT

On May 13, 1991 at approximately 1700 hours, I stopped at a homicide scene located at 3610 Dalrymple Rd., Chesapeake Beach, MD. I didn't enter the resident but conversed with Detective Sergeant R. Hampshire and the investigator, Trooper First Class B.C. Newcomer. After learning what had occurred, TFC Newcomer and I agreed that Paul Marcello Holland and Leonard Anthony Long should be considered suspects.

I left the scene at approximately 1720 hours and went to where the victim's vehicle had been located. I conversed with State Police Sgt. G. Linger and Lt. W. Freeland of the Sheriff's Office. I then continued northeast on Bayside Rd. to State Route 261 with the intention of securing for the day. As I passed the Rod 'N Reel Restaurant, I observed who I believed to be Leonard Long walking across the parking lot toward the Restaurant. I turned around and went back to confirm his identity. As I pulled up beside him, he continued walking and asked what I wanted. I asked him what he was up to - he replied that he was going to see his mother who was working at the restaurant. At that time he was wearing a bright green colored cap with a bill, multi-colored wide striped shorts and sandals. It was further noted that he had grass seeds and other vegetation on his shorts and stuck in the hair on his legs.

On June 19, 1991 both Paul Holland Leonard Long were in custody at the Calvert County Sheriffs Office after being arrested on unrelated charges. TFC Newcomer was notified of this and was requested to respond to the office. It should be noted that prior discussions had been held regarding the arrest warrants and that it would be an opportune time to question them about the Homicide.

At approximately 1500 hours (6-19-91), Paul Holland was brought into the Sheriff's Dept. Investigators' Office. Present were Detective W. Soper of the Sheriff's Office, TFC B.C. Newcomer of the Maryland State Police, and myself. Detective Soper advised Holland that he had been arrested for a Breaking and Entering that had occurred in Chaneyville, Calvert County, Maryland. He continued by explaining the circumstances and probable cause pertaining to that offense. Detective Soper then proceeded to advise Holland of his rights under the Miranda Decision. This was done from a "Rights Card". After each right, Holland acknowledged that he understood and that he elected to waive those rights. It should be noted that in addition to the Breaking and Entering, Holland was told that we also wanted to discuss the Pellicano homicide with him and to ask him some questions pertaining to that crime. This was done prior to the

acknowledgment and waiver of his rights. In addition, I asked Holland how far he had gone in school and if he was sure that he understood and elected to talk to us.

TFC Newcomer led into the questioning about the homicide. Holland admitted that he knew the victim's son - that on several occasions he had picked him (Holland) up while walking the road. He advised that on one occasion, Mrs. Pellicano was with her son when he was picked up. Holland also said that he had played basketball on several occasions with the victim's son. He denied ever going to their house. Most of this interview was with Holland explaining his activities on the day of the murder. He stated that he had worked with his father on the trash trucks. He was not consistent - at first he stated they finished around 1130 hours and eventually ended up saying that he had helped his father all day up until 1600 hours. During the interview Holland signed a consent form volunteering to give blood and hair samples as well as handwriting examples. I supervised the taking of the handwriting examples. A medical technician from the jail took the blood and Holland himself contributed the hair samples.

During the interview with Holland, he seemed to be relatively calm, although at times a bit confused. This was up until I started taking the handwriting specimens. At that time he began to perspire profusely and was obviously very nervous.

He was told that we had found some of the victim's checks along the road - that they were being processed for fingerprints and a handwriting analysis would be done to determine who had prepared them. I told him that if he had touched the checks or had happened to pick them after finding them along the road edge, that now was the time to let someone know. At that time he replied, "I don't think I found any checks on the side of the road." I then said, "If you did, surely you would remember." He replied, "No, no, I didn't find no checks." The interview was very low key, it being our intention to persuade Holland to submit to a polygraph examination the following day.

At approximately 1815 hours (6-19-91) Leonard Long was brought into the same room for questioning. The same officers were present. He, too, was advised of his rights by Detective Soper. He was told that he was under arrest for Assault and Violation of Probation and that we wanted to talk to him about the Pellicano murder. He acknowledged that he understood his rights and elected to waive them. He was shown a Consent to Search form and agreed to giving handwriting specimens, blood, and hair samples. This followed the explanation of the form to him as well as his right of refusal. During the interview with Long, he denied involvement and stated he had stayed home on the day in question and his mother and grandmother would verify it. I reminded him that I had spoken to him on the Rod 'N Reel parking lot the day of the murder. He acknowledged the conversation had taken place but tried to insist it occurred the day after. While in the process of collecting handwriting specimens from Long, the checks

were passed quickly in front of him. This was done to let him know they had been found and to see his reaction. When this was done, Long stated, "I know whose handwriting that is." Right away I knew that he had not seen them well enough to make that determination. After very little prompting, he said that he knew it was Anthony Gray's handwriting and that he had remembered it from school.

On June 20, 1991 at approximately 1800 hours, TFC Newcomer called me advising that Holland's Polygraph Test had proven deceptive. He further invited me to the Barrack to assist him in the interrogation. I arrived there at approximately 1815 hours and the interrogation began in an office within the State Police Barracks designated for this purpose. TFC Newcomer asked Holland if he understood his Miranda Rights as had been explained by Cpl. Williams, the Polygraph Examiner. He stated that he had understood them and elected to waive them and submit to questioning about the Pellicano homicide. During the interrogation the following lines of investigation were pursued: he was told that he failed the polygraph; his handwriting appeared to be the same as that on the recovered checks; the crime scene had been processed and numerous latent prints recovered that may match his; he had been seen in the area of the crime during the time it was committed; the victim's vehicle had been abandoned near his residence; that he had gone across the street to determine exactly what his neighbors had observed and told the police pertaining to the victim's vehicle; that latent fingerprints may be matched if he had touched the checks or had been in the victim's vehicle; and DNA testing was explained to him.

He was further told that Leonard Long had confessed and implicated him as being the main perpetrator. At first Holland denied involvement stating he had been working with his father on the trash truck in the morning and later purchased drugs and shared them with a Soper girl who resided on Route 261 near Christiana Parran Rd. Approximately ninety minutes into the interrogation Holland said that he was there but he didn't go in the victim's house. He stated he waited on the road while Leonard Long and Anthony Gray entered the house through a rear window. I inquired as how he knew entry was gained through a rear window if he remained near the road. He stated that he just assumed that was how they got in.

It should be noted that when Holland implicated Anthony Gray, what Long had said the previous day began to figure in. It then became obvious what Long had been trying to do the previous day was to implicate Anthony Gray by saying that it was his handwriting. Up until that point, Gray was not a suspect nor had his name been mentioned during the interviews with Holland and Long.

As the interrogation continued I asked Holland if he actually waited on the road edge or did he wait in the woods. He stated

he waited in the woods until he saw the victim pull into the driveway. He continued by stating that he left and walked home. I asked him if there had been a discussion between the three of them prior to the break in. He stated there was. He was to be the lookout while they went in and got money to purchase drugs. At that time the questioning stopped with the intention of getting a taped statement from Holland.

However, when the questioning continued, Holland replied that had just been kidding, he had worked with his father that day and hadn't been near the victim's house. The interrogation continued for approximately fifteen (15) minutes without any further admissions by Holland. As we proceeded to take him to a holding cell on the lower level, TFC Newcomer told Holland that he had confessed and that it was too late to retract his previous statements. He still insisted he had been kidding.

I turned to TFC Newcomer and told him to place Holland in the cell, that I had known Leonard Long for many years, that I know his mother, grandmother, aunts & uncles and that he would be very cooperative. At that time Holland advised that he wanted to talk some more. He was taken into the Barrack Conference Room and immediately stated that what he had told us earlier about being a lookout was the truth. He refused to elaborate and was placed in the holding cell. The interviews with Holland were kept "low key." There was no raising of our voices or the use of the good guy-bad guy routine. We tried to portray ourselves as being sympathetic to the fact a breaking and entering had led to a homicide. We did our best to convince him that depending on the results of laboratory testing, there would be an abundance of evidence against him.

Later this same date (6-20-91) at 2300 hours, Leonard Long was tested on the Polygraph by Cpl. C. Williams. At the conclusion of the testing, it was his opinion that Long's tests were deceptive. TFC Newcomer and I began interrogating Long at approximately 0100 hours on June 21, 1991. This took place in the Barrack Polygraph Examiner's Office. Again TFC Newcomer advised him that his rights under Miranda were still in effect. He continued to deny involvement insisting that, at the request of his mother, he stayed at home with his grandmother.

At 0300 hours, TFC Cameron came to me at the Barrack and advised that he and TFC Newcomer had been questioning Anthony Gray. He further stated that it was his opinion that Gray was at the point where he was ready to confess. He requested that I assist in the interrogation. I went to the Polygraph Room and joined TFC Newcomer. Within twenty (20) minutes, Gray admitted involvement. He stated that on the day in question he, Long, and Holland had all met near the intersection of Dalrymple and Christiana Parran Rd. He continued by saying they decided to break into the victim's residence to look for money to purchase crack cocaine. He said he waited in the woods while Paul Holland and Leonard Long went to the rear of the victim's residence. He alleged he

stayed there until he observed a small blue car pull into the driveway. At that time, he claimed, he walked down Christiana Parran Rd. to "Noony" Jones (Marvin Gray) trailer where he spent the rest of the day. During the interrogation Gray advised that his sister Novella had asked Holland if he was involved in the murder. This was shortly after the crime had occurred. Holland's response was alleged to be "Yea, I killed her and if you fuck with me, I'll kill you too."

At 1500 hours on June 21, 1991, Paul Holland was again interviewed by TFC Newcomer and I. This took place in the Barrack Interrogation Room. Holland acknowledged that he understood his rights and elected to waive them after TFC Newcomer read them from a card. He was asked about his statement to Novella Gray. At first he denied making the statement but with little prompting, admitted making it, saying he had been drinking at the time. Although Holland made no further admissions during this interrogation, when questioned again about the checks and told the handwriting looked like his, he blurted out, "Leonard took the fucking checks over to Mt. Hope."

At approximately 1800 hours this date, Leonard Long requested to see me. He was in the Barrack Polygraph Room at the time. He stated to me, "Stinnett, I need some advice." He told me that he realized that he was in trouble and didn't know what course of action to take. Again I tried to get him to confess, but without success.