IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**ANTHONY GRAY**                                    *

     Plaintiff                                       *          Civil No. CCB-02-CV-385

v.                                                 *

**STATE OF MARYLAND, et al.**                      *

                                                   *

     Defendants.

*     *     *     *     *     *     *     *     *     *     *

## OPPOSITION TO ALL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

     Plaintiff, ANTHONY GRAY, by his attorneys, Alan Hilliard Legum, Kathleen Duckett McCann, Alan Hilliard Legum, P.A., Joel L. Katz and Joel L. Katz, L.L.C., hereby responds in opposition to Defendants State of Maryland, Brian Newcomer, Richard Sheldon's Motion for Summary Judgment, and to Calvert County and Lawrence Stinnett's Motion for Summary Judgment and requests that the Motions be denied. The grounds, points and authorities for Plaintiff's Opposition are set forth more fully in the accompanying Memorandum of Law filed herewith.

          *Kathleen Duckett McCann*

          Kathleen Duckett McCann
          Federal Bar No.: 25332
          Alan Hilliard Legum
          ALAN HILLIARD LEGUM, P.A.
          275 West Street
          Suite 305
          Annapolis, Maryland   21401
          410-263-3001

Joel L. Katz
JOEL L. KATZ, L.L.C.
2060 West Street
Annapolis, Maryland 21401

*Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th  day of January, 2004, the Plaintiff's Opposition to Defendants' Motions for Summary Judgment and Plaintiff's supporting Memorandum of Law were e-filed with copies to:

Kevin Karpinski, Esquire
ALLEN, KARPINSKI, BRYANT & KARP
100 E. Pratt Street, Ste. 1540
Baltimore, Maryland   21202

Donald E. Hoffman, Esquire
Assistant Attorney General
Maryland State Police
1201 Reisterstown Rd.
Pikesville, Maryland 21208


*Kathleen Duckett McCann*
Kathleen Duckett McCann

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

Civil Action No.: CCB-02-CV-385

_____

ANTHONY GRAY, *Plaintiff*

v.

STATE OF MARYLAND, et al., *Defendants*

_____

PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

_____

Kathleen Duckett McCann
Federal Bar No.: 25332
Alan Hilliard Legum
ALAN HILLIARD LEGUM, P.A.
275 West Street
Suite 305
Annapolis, Maryland  21401
410-263-3001


Joel L. Katz
JOEL L. KATZ, L.L.C.
2060 West Street
Annapolis, Maryland 21401

*Attorneys for the Plaintiff*

TABLE OF CONTENTS

I.      DISPUTED MATERIAL FACTS; FACTS SUPPORTING
        PLAINTIFF'S CLAIMS; INFERENCES TO BE DRAWN
        IN FAVOR OF PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PROCEDURAL STATUS OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.     GRAY HAS NOT PRODUCED SUFFICIENT EVIDENCE
        AT THIS TIME TO SUSTAIN COUNT VIII 42 U.S.C. §1981
        AGAINST ANY OF THE DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.      ARGUMENT AGAINST DEFENDANTS'
        CLAIMS OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      The Eleventh Amendment Does Not Bar Claims
                Against Individual Defendants In Their Individual Capacities . . . . . . . . . . . . . 13

        B.      Defendants Newcomer, Stinnett and Sheldon Are
                Not Entitled to Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.      Defendants Are Not Entitled to Statutory Immunity Under
                Md. Code Ann. Courts & Judicial Proceedings Article §5-522(b)(1) . . . . . . . . 16

VI.     ARGUMENTS AGAINST SUMMARY JUDGMENT
        AS TO STATE LAW CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.      Gray Has Established All Elements Of His Malicious Prosecution
                Claim Against Defendants Newcomer, Stinnett and Sheldon . . . . . . . . . . . . . 18

        B.      Gray Has Established All Elements Of His Claims Under
                Article 24 of the Maryland Declaration of Rights Against
                Defendants Newcomer, Stinnett and Sheldon . . . . . . . . . . . . . . . . . . . . . . . . . 22

        C.      Defendant Stinnett, as Sheriff of Calvert County, was a
                State Employee, Not A County Employee; The Local Government
                Tort Claims Act is Inapplicable; Calvert County Is Not
                Vicariously Liable Under State Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VII.    ARGUMENTS OPPOSING SUMMARY JUDGMENT
        AS TO REMAINING FEDERAL CLAIM UNDER 42 U.S.C. §1983 . . . . . . . . . . . . . . 26

        A.    Gray Has Established All Elements of His Claims Under
              42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VIII.   CONCLUSION    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## LIST OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Anthony Gray Deposition Excerpts |
| 2 | State of Maryland, Newcomer, Sheldon's Responses to Request for Admissions Excerpts |
| 3 | Calvert County and Stinnett's Responses to Request for Admission |
| 4 | Brian Necomer Deposition Excerpts |
| 5 | Lawrence Stinnett Deposition Excerpts |
| 6 | Anthony Gray Polygraph Results |
| 7 | Affidavit of Anthony Gray |
| 8 | Anthony Gray's August 6, 1991 Statement |
| 9 | Brian Newcomer's Supplemental Narrative Report |
| 10 | George Kirkham Deposition Excerpts |
| 11 | Lloyd Reece Trimmer Deposition Excerpts |
| 12 | George Kirkham Report |
| 13 | Charging Document/Application for Statement of Charges/Statement of Probable Cause |
| 14 | Docket Entries: State v. Gray |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ANTHONY GRAY** | * | |
| Plaintiff | * | Civil No. CCB-02-CV-385 |
| v. | * | |
| **STATE OF MARYLAND, et al.** | * | |
| | * | |
| Defendants. | | |

\*      \*    \*   \*        \*        \*        \*        \*        \*        \*        \*        \*

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

I.   **DISPUTED MATERIAL FACTS; FACTS SUPPORTING PLAINTIFF'S
      CLAIMS; INFERENCES TO BE DRAWN IN FAVOR OF  PLAINTIFF**

Plaintiff Anthony Gray disputes the following facts as asserted by Defendants State of

Maryland, Brian Newcomer and Richard Sheldon in their Motion for Summary Judgment:

1.    Plaintiff Anthony Gray ("Gray") is of limited intelligence.  He was in special

education classes during the time he was in school and he dropped out of school after the

eleventh grade because he " did not want to go."  Gray Deposition at 11-12, 104, attached as

Exhibit 1; Response to Request for Admissions by Defendant State of Maryland, *et al.*, no.

32, attached as Exhibit 2; Response to Request for Admissions by Defendant Calvert County,

*et ux.*, no. 32, attached as Exhibit 3.

2.    Gray was interrogated off and on June 20 into June 21, 1991 by Defendants

Stinnett and Newcomer without being advised of his rights.  See Defendant State of

Maryland, *et al.*  Memorandum at 3.  In Gray's deposition, making specific reference to the

statement Gray gave Defendants Newcomer and Stinnett, deposing counsel asked, "you were,

in fact advised of your rights, correct?" Gray responded, "I don't remember being advised of my rights. No sir. I don't remember that." Exhibit 1 at 69. A reasonable interpretation of that exchange, construed favorably to Plaintiff, is that he was disagreeing with the statement made by counsel. Questioning along those lines became increasingly confusing to Gray with deposing counsel attempting to elicit from Gray that he could have been advised of his rights, and Gray maintaining that he had no recollection of being advised of his rights. Exhibit 1 at 69-73. Later in the deposition, counsel for Gray asked Gray out right, "Prior to Deposition Number 3 (Gray's June 21, 1991 statement), did they advise you of your rights?" Gray answered, "No sir." Exhibit 1 at 107. Given the evidence in the record, and construing it most favorably to Gray, the issue of whether Gray was advised of his rights is a question for the trier of fact. Notwithstanding the question of whether any advice of rights given, the evidence makes clear that there was no meaningful advice of rights given, and no knowing and intelligent waiver by Gray.

3.     After Gray was picked up by Defendants Stinnett and Newcomer on June 20, 1991, without a warrant, at approximately 5:30 p.m, through the time he made his first statement at approximately 4:00 a.m. on June 21, 1991, he asked repeatedly to call his family so that he could get an attorney. He also asked repeatedly for an attorney. Defendants Stinnett and Newcomer would not permit him to make a call, talk to an attorney, or talk to anyone but them. Exhibit 1 at 105-07. Defendant Newcomer does not recall Gray asking for an attorney or asking to make any calls, however, there is nothing in the record about Gray making any calls. See Newcomer Deposition at 68-69, attached as Exhibit 4. Defendant Stinnett has no recollection of Gray asking to call his family or for a lawyer. See Stinnett

Deposition at 78, attached as Exhibit 5.

  4. During the time Gray was in the custody of Defendants Newcomer and Stinnett from 5:30 p.m. June 20, through approximately 4:00 a.m. June 21, 1991, he was not provided with any food and the last time he had eaten was at noon on June 20.  Exhibit 1 at 108-09. Defendant Stinnett testified that no one asked Gray when he last ate.  Exhibit 5 at 32-34. Newcomer testified that he obtained food for Gray, however, he has no recollection of any details of his providing food for Gray.  Defendant Newcomer admitted that there was no food on the premises, that he would have had to have ordered out for food, that there was no log or any other type of record indicating that food was actually ordered or when Gray last ate, and that such information would typically be listed on an arrest detention log but no such entry was made in this case.  Exhibit 4 at 73-78.

  5. During the time Gray was in the custody of Defendants Newcomer and Stinnett from 5:30 p.m. June 20, through approximately 4:00 a.m. June 21, 1991, he was questioned off and on and was not allowed to sleep.  He had been up since 6:30 a.m. June 20 and, as of 4:00 a.m. on June 21 when he made his first statement, he had not slept.  His cell contained only cold concrete and Defendants Stinnett and Newcomer kept coming in all night long.  Exhibit 1 at 108, 118-19.  Neither Defendant Stinnett nor Defendant Newcomer asked Gray when he had last slept.  Exhibit 5 at 40-41; Exhibit 4 at 63-64.  Defendant Newcomer admitted that it would not be an impossibility that there was only a concrete slab in Gray's holding cell.  Exhibit 4 at 113.

  6. During the time Gray was in the custody of Defendants Newcomer and Stinnett from 5:30 p.m. June 20, through approximately 4:00 a.m. June 21, 1991 Defendant

Stinnett, in the presence of and with the acquiescence of Defendant Newcomer, repeatedly made remarks to Gray that if he did not confess he would be electrocuted - that he would "fry," "be like a charcoal."  Exhibit 1 at 63-64, 109-10.  Defendant Stinnett denies making such statements.  Exhibit5 at 31.  And Defendant Newcomer does not recall Defendant Stinnet making such statements and he "[does not] recall being a part of that (advising Gray that, if he confessed, he would not get the death penalty)."  Exhibit 4 at 65-67.

7.    Defendants Newcomer and Stinnett lied to Gray by telling him that he had flunked the polygraph when, in fact, the results came back "inconclusive."  See Polygraph results attached as Exhibit 6.

8.    With respect to Gray's June 21, 1991 statement, Defendants Newcomer and Stinnett told Gray facts about the crime so that he could make the statement.  Affidavit of Gray attached as Exhibit 7.  Gray did not believe he would be charged with the crime by giving the June 21, 1991 statement; he gave the statement because "they [were] telling [him he] was going to get the electric chair."  "So [he] had to do something."  "Why should [he] die for something [he] didn't do."  Exhibit 1 at 123-24.

9.    Gray requested a lawyer every time he spoke with police, including when he spoke with Defendants Newcomer and Sheldon on August 6, 1991.  Exhibit 1 at 115-118; Exhibit 7.

10.    The interrogation of Gray on August 6, 1991, prior to his giving the August 6, 1991  recorded statement, was conducted by Defendants Sheldon and Newcomer.  Gray made requests to Defendants Sheldon and Newcomer that he be permitted to speak to a lawyer on August 6, 1991, but his requests were denied by both Defendants.  Exhibit 7.

-4-

11.   Defendants Sheldon and Newcomer reminded Gray what Defendant Stinnett said would happen to him if he did not confess to the Pellicano crimes.  Exhibit 7.

12.  Regarding Gray's August 6, 1991 recorded statement, Defendants Sheldon and Newcomer told Gray, in detail, what they wanted him to say on the tape.  Exhibit 7.

13.  Regarding Gray's August 6, 1991 recorded statement, Defendants Sheldon and Newcomer described the condition of the crime scene, including the condition of the victim's body, so that he would be able to give details in his recorded statement consistent with the evidence.  Exhibit 7.

14.  During Gray's August 6, 1991 tape recorded statement, Defendants Sheldon and Newcomer stopped the tape repeatedly in order to correct mis-statements made by Gray. Exhibit 7.

15.  Defendant Sheldon took Gray's August 6, 1991 statement in which Sheldon leads Gray through events consistent with the evidence.  See Gray's August 6, 1991 Statement attached as Exhibit 8.  Gray's  statement contains numerous occurrences of leading by Defendant Sheldon, as well as factual errors and discrepancies when compared to the evidence found at the crime scene as described by Defendant Newcomer in his written Supplemental Narrative Report, attached as Exhibit 9, for example:

a.   Discrepancy:  Gray stated that then-co-defendant, Paul Holland, popped the screen to the Pellicano girl's bedroom out and "threw it down in the woods in back of the house."  When asked how Holland threw it, Gray indicated, stating, "he just took his hand and threw it like that."  Exhibit 8 at 3.  The evidence indicated that "the screen belonging to the window at the point of entry was located by [Newcomer], approximately thirty five feet to

the north side of the house, about five feet into the woods behind a large tree.  The screen appeared to be folded and placed in that area as opposed to being just dropped on the ground."  Exhibit 9 at 5.

   b. Discrepancy:  Gray stated that he searched in the boy's room for money - " through things, drawers, underneath the bed, in the closet."  Exhibit 8 at 4.  The evidence indicated that the boy's room "was very undisturbed.  The closet doors were open, but there appeared to be little sign of disarray in that room."  Exhibit 9 at 5.

   c. Leading by Defendant Sheldon:  Gray stated that co-defendant Paul Holland was standing "behind the door where [the victim] come in at;" that the victim came in through "the door where you come into the kitchen." Defendant Sheldon, leading, stated "Okay, so Paul was hiding behind the doorway there by the kitchen?"  And Gray simply agreed.  Exhibit 8 at 6.

   d. Discrepancy with leading by Defendant Sheldon:  Gray states that co-defendant Paul Holland grabbed the victim around the neck and began choking her; that she began yelling loudly and co-defendant Leonard Long went and got a butcher knife from the kitchen drawer and gave it to Holland and Holland stabbed her "up in her chest somewhere up in her chest."  Exhibit 8 at 6-7.  He then stated that the victim's body fell to the floor, was jumping around, and then stopped shaking at which time Holland pulled out the knife.  Id. Gray then began to describe a rape of the victim's apparently dead body by Holland whereby Defendant Sheldon asked: "Was she moving at all when he was having sex with her?" and Gray said "no."  Id.  Sheldon then asked, "did there come a time that he put anything around her face or her neck or anything?  Gray responded that he "didn't see him put [anything]

-6-

around her face." Id. at 8. The evidence revealed that the victim "had a white plastic bag, similar to the grocery type bag, pulled all the way over her head, and it was tightly knotted at the throat."  Exhibit 9 at 3.

      e.   Discrepancy with leading by Defendant Sheldon: Defendant Sheldon asked Gray whether Holland put anything around her neck and Gray stated, "a rope like." Exhibit 8 at 8. Gray also stated that Holland tied the victim's hands behind her back "with a string or rope or something" after he had sex with her, and that he "guess[ed] [Holland] got [it ] out [of] the bedroom."  Exhibit 8 at 11.  The evidence revealed that, in addition to the white plastic bag over the victim's head, which had been tied tightly around her neck, (1) lady's pantyhose were wrapped one time around her neck and connected down to where her hands were tied behind her back with a pink bathrobe belt; (2) a man's brown necktie had been used as a blindfold and trailed down her back and was connected to where her hands were tied with the bathrobe belt; (4) a telephone cord was tied one time tightly around her neck; and (5) a white sock had been inserted into the victim's mouth which appeared to be used as a gag.  Exhibit 9 at 3.

      f.   Discrepancy: Gray stated that, other than the screw driver to pry open the window to gain entry, only one knife was used.  Exhibit 8 at 6, 15.  The evidence revealed that two knives were involved - one "wooden handled kitchen knife, approximately seven (7) inches in length, with a serrated blade was observed in a clothes basket on a chair at the entrance to the hallway adjoining the dining room.  The blade of the knife was bent at a forty five (45) degree angle, and on one side of the blade, there was a small smear of blood." Another kitchen knife, approximately nine (9) inches in length, blade length, was located

approximately one foot from the victim's right hand. The blade of the knife was completely covered in blood indicating that it had been completed (*sic*) inserted into her chest cavity. The knife was laying just outside of the threshold entrance to the bathroom." Exhibit 8 at 4.

       g.   Discrepancy: Defendant Newcomer asked Gray whether "anybody tr[ied] to cook something while [they] were in the house. Gray answered, "well Leonard he turned on the gas." Defendant Newcomer asked, "what gas?" Gray responded, "the gas on the stove, he turned the stove on." Gray further elaborated, ". . . you could smell gas coming out. . . . it was the oven too." Exhibit 8 at 19-21. The evidence revealed that the victim had an electric range and that all four burners were on high. Exhibit 9 at 3.

      16.   There was no physical evidence to link Gray (or either of his co-defendants) to this crime; the DNA evidence did not match Gray's DNA, the fingerprint evidence did not match Gray's fingerprints, the hair evidence did not match Gray's hair, the handwriting on the stolen checks did not match Gray's handwriting. Exhibit 4 at 41-45. Other than Gray's forced confession and the statements by his co-defendants, both of which were found not guilty, there was no evidence to link Gray to the crime. Exhibit 4 at 133-34.

      17.   In their respective professional opinions, after reviewing the criminal case file, neither Gray's police expert, George Kirkham, nor Defendants' expert, Lloyd Reece Trimmer, believes that Gray was involved in the Pellicano crime. Kirkham Deposition at 39, attached as Exhibit 10; Trimmer Deposition at 5-6, attached as Exhibit 11.

      18.   In his professional opinion, based on his review of the criminal investigation and criminal case against Anthony Gray, Gray's police expert, George Kirkham ("Kirkham") stated that he had "never seen anything this egregious . . . in terms of police investigative

procedure violations, and that it was shocking . . . ." Exhibit 10 at 33.

19.  Among the police violations Kirkham identified are the following: (1) no signed Miranda waiver from the initial June 20-21, 1991 interview; (2) no visual or auditory record of what the police were doing or saying to Gray from 6:00 p.m. on June 20 through 4:00 a.m. June 21, 1991 given that the police have the burden to show that Gray knowingly and intelligently waived his rights in this gravest of matters; (3) no physical evidence to link Gray to the crime, e.g., no fingerprint evidence, no blood evidence, no fiber evidence - nothing - notwithstanding the fact that there should have been ample physical evidence given the nature of the crime; (4) the conditions of interrogation - draconian, e.g., Gray had been awake since 6:30 a.m. on June 20th; Newcomer does not know when Gray last slept; Gray had last eaten at lunchtime on June 20th; Gray claims he was not fed; Newcomer has no documentation that Gray was fed; (5) alibi evidence was not investigated; letter sent by Anthony Flemming to the State's Attorney's Office stating he knew things about the crime was not followed up on by Newcomer, the lead investigator; (6) the handwriting evidence did not match Gray's handwriting (or that of the co-defendants). Exhibit 10 at 35-46; Kirkham Report attached as Exhibit 12; Exhibit 4 at 103-105 (re Flemming letter).

20.  In approximately 1997, another group of Maryland State Police interviewed Anthony Flemming, took samples from him, found his DNA matched DNA taken from the victim, and Flemming was eventually convicted of committing the Pellicano crime. Exhibit 4 at 104-05.

21.  With respect to Gray, Defendant Newcomer obtained the charging document on June 21, 1991, AFTER Gray's first statement. Defendant Newcomer's Affidavit contained

Gray's June 21st statement.  Charging Document (including Application for Statement of Charges/Statement of Probable Cause), signed by Defendant Newcomer, at 5, attached as Exhibit 13.  Thus, the probable cause determination by the judicial officer which authorized the continuing detention of Gray was necessarily based on Gray's coerced June 21st confession.

22.    Despite the complete lack of evidence and the fact that another individual has been convicted of the Pellicano crime, both Defendants Stinnett and Newcomer continue to maintain, which they obviously must,  that Gray is guilty.  Exhibits 2 and 3 at nos. 66 and 67.

23.    Kirkham concludes in his report that the arrest, detention and prosecution of Gray for the rape and murder of Pellicano was the result of "official misconduct."  Exhibit 12.

24.    Seven and one half years later, Gray's conviction was vacated and the State requested the entry of a nolle pros which was granted by the Circuit Court.  See Docket Sheet in State v. Gray, attached as Exhibit 14.

## II.    PROCEDURAL STATUS OF THE CASE

The Counts Remaining as to each of the Defendants are as follows:

A.    State of Maryland

    1.    Count VIII:    42 U.S.C. § 1981

B.    Calvert County

    1.    Count I:    Malicious Prosecution

    2.    Count IV:    Article 24, Maryland Declaration of Rights

    3.    Count VII:    42 U.S.C. § 1983

4.      Count VIII:     42 U.S.C. § 1981

C.     Brian Newcomer and Richard Sheldon (Official Capacities)

1.      Count I:         Malicious Prosecution

2.      Count IV:       Article 24, Maryland Declaration of Rights

3.      Count VIII:     42 U.S.C. § 1981

D.     Brian Newcomer and Richard Sheldon (Individual Capacities)

1.      Count I:         Malicious Prosecution

2.      Count IV:       Article 24, Maryland Declaration of Rights

3.      Count VII:      42 U.S.C. § 1983

4.      Count VIII:     42 U.S.C. § 1981

E.     Lawrence Stinnett (Official Capacity)

1.      42 U.S.C. § 1981

F.     Lawrence Stinnett (Individual Capacity)

1.      Count I:         Malicious Prosecution

2.      Count IV:       Article 24, Maryland Declaration of Rights

3.      Count VII:      42 U.S.C. § 1983

4.      Count VIII:     42 U.S.C. § 1981

## III.    STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). District Courts are accorded wide

latitude in assessing the sufficiency and quality of evidence offered in support of, or against, a

motion for summary judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986);

Matsuchita Elect. Indus. Co. v. Zenith Radio, 475 U.S. 574 (1986).

      When seeking summary judgment, the moving party has the burden of proving that

the material facts, as presented, are not in dispute and that there is no reasonable dispute as to

the legal conclusions to be drawn from those facts.  Adickes v. Kress & Co., 398 U.S. 144,

157 (1970); Morrison v. Nissan Co., Ltd., 601 F.2d 139, 141 (4th Cir. 1979); Carroll v. United

Steelworkers of America, 498 F. Supp. 976, 978 (D. Md. 1980).  "[A]t the summary

judgment stage the judge's function is not himself to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A District Court may not grant summary

judgment if it determines "the evidence is such that a reasonable jury could return a verdict

for the non-moving party, nor is it appropriate 'even where there is no dispute as to the

evidentiary facts but only as to the conclusions to be drawn therefrom.'"  Gordon v. Kidd, 971

F.2d 1087, 1093 (4th Cir. 1993) (quoting Charbonnages de France v. Smith, 597 F.2d 406,

414 (4th Cir. 1979) (citations omitted); Lendino v. Trans Union Credit Information Co., 970

F.2d 1110, 1112-13 (2d Cir. 1992).  In addition, a defense based on good faith, encompassing

a subjective element, is generally a question of fact requiring resolution by a jury.  See

Harlow v. Fitzgerald, 457 U.S. 800, 815-16 (1982) (internal citations omitted).  Finally, in

deciding a motion for summary judgment, the Court must view the record in a light most

favorable to the non-moving party and must draw all inferences most favorable to that party.

Id.

In this case, as noted above, there are many material facts either in dispute or capable of being construed in Gray's favor. In addition, this case involves defenses of qualified immunity which necessarily encompass arguments of good faith, and which implicate the credibility of the parties. Accordingly, this case is not appropriate for resolution on a motion for summary judgment and the Defendants' motions must be denied.

## IV.    GRAY HAS NOT PRODUCED SUFFICIENT EVIDENCE AT THIS TIME TO SUSTAIN COUNT VIII 42 U.S.C. § 1981 AGAINST ANY OF THE DEFENDANTS

Although Gray maintains that the unlawful actions taken against him by the Defendants were, at least in part, motivated by racial animus, he has been unable to produce sufficient evidence to sustain this Count under the law.

## V.    ARGUMENT AGAINST DEFENDANTS' CLAIMS OF IMMUNITY

### A.    The Eleventh Amendment Does Not Bar Claims Against Individual Defendants In Their Individual Capacities

The Eleventh Amendment does not protect state actors sued in their individual capacities. Middlebrooks v. University of Maryland, 980 F. Supp. 824, 828 (1997) (citing Biggs v. Meadows, 66 F.3d 56, 60 (4th Cir. 1995)). Plaintiff has sued Defendants Newcomer, Stinnett and Sheldon in their individual capacities as well as in their official capacities. Although the Eleventh Amendment protects state actors such as Defendants Newcomer, Sheldon and Stinnett in their official capacities, it affords no such protection in their individual capacities. Id. See also Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995). Thus, Count I (malicious prosecution), Count IV (Article 24 of the Maryland Declaration of Rights), and Count VII (42 U.S.C. § 1983) are viable against Defendants Newcomer, Stinnett

and Sheldon in their individual capacities.

**B.    Defendants Newcomer, Stinnett and Sheldon Are
         Not Entitled to Qualified Immunity**

Defendants have re-raised the same unsuccessful arguments with respect to qualified immunity that they raised in their Motions to Dismiss. This Court declined to accept those arguments in its Opinion and Order dated September 12, 2002. Since that time, Gray has established ample substantive evidence that these Defendants violated clearly established constitutional rights that any trained and minimally competent law enforcement officer would know about. See Exhibit 12. Hence, now there is even less basis for the Court to over rule itself on this issue.

The defense of qualified immunity, also known as "good faith" immunity, involves both a subjective as well as an objective element. Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982). "The objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.'" Id. (citing Wood v. Strickland, 420 U.S. 308, 322 (1975)). "The subjective component refers to 'permissible intentions.'" Id. "Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury. . . .'" Ibid. (Emphasis in original).

In the instant case, citing Gould v. Davis, 165 F.3d 265, 269 (4th Cir. 1998), this Court properly noted, "[w]hen evaluating a claim of qualified immunity, the court must identify the

specific constitutional right allegedly violated, and then determine whether that right was 'clearly established,' and whether a reasonable person in the defendant's position would have understood that his or her actions would violate that right." Gray, 228 F. Supp. 2d at 637-38. This Court has determined that Gray's Amended Complaint sufficiently alleged a Fourth Amendment violation. Id. In addition, Gray submits, as explained in Section VI.A, pages 24-26, infra, that he has also sufficiently alleged violations of his clearly established Fifth and Fourteenth Amendment constitutional rights. Nevertheless, in its September 12, 2002 ruling, this Court determined that, because Gray had alleged lack of probable cause to detain him and, further, that "'throughout' the investigation of Gray, 'defendants had no rational reason to believe that Gray had committed the crime,'" he had alleged the violation of a clearly established constitutional right and that Defendants should have known that their conduct would violate that right. Id.

Since this Court's September 12, 2002 decision, Gray has put forth substantive evidence of the following conduct on the part of Defendants:   (1) failing to advise Gray of his Constitutional rights after he was arrested (Newcomer and Stinnett), (2) denying Gray his right to an attorney (Newcomer, Stinnett and Sheldon), (3) denying Gray the right to make a phone call to his family for the purpose of getting an attorney (Newcomer, Stinnett and Sheldon), (4) threatening (directly or indirectly through acquiescence to Stinnett's conduct) Gray with the death penalty - specifically the electric chair (Newcomer, Stinnett and Sheldon), (5) intimidating Gray (Newcomer, Stinnett and Sheldon), (6) taking advantage of Gray's limited intelligence and vulnerability (Newcomer, Stinnett and Sheldon), (7) depriving Gray of food (Newcomer and Stinnett), (8) depriving Gray of sleep (Newcomer and

-15-

Stinnett), (9) lying to Gray about the evidence when there was no such evidence or probable cause (Newcomer, Stinnett and Sheldon), and (10) lying to Gray about the results of his polygraph for purposes of intimidation when there was no evidence or probable cause (Newcomer, Stinnett and Sheldon). For Defendants to say that they did not know these actions were violations of Gray's clearly established constitutional rights is truly incredible and, as this Court previously ruled, their defenses of qualified immunity must fail.

### C. Defendants Are Not Entitled to Statutory Immunity Under Md. Code. Ann. Courts & Judicial Proceedings Article § 5-522(b)(1)

Maryland law provides statutory immunity to State personnel, as defined in the State Government Article, Md. Code Ann. § 12-101, for tortious acts or omissions made within the scope of their office and "made without malice or gross negligence." Md. Code Ann. State Government Article § 5-522(b)(1). Defendant Stinnett argues that he did not act with malice and that Plaintiff Gray did not allege that he acted with gross negligence, the two conditions under which immunity would, arguably, apply. He then argues that he is immune from liability under § 5-522(b)(1). Defendant Stinnett's argument that his conduct could not, as a matter of law, be described as malicious or grossly negligent is incorrect. Threatening *any* detainee with the electric chair, much less one of limited intellectual capacity, such as Gray, can certainly be characterized as malicious. Moreover, even if Defendant Stinnett's actions could be characterized as "mere" gross negligence, he still would not be entitled to immunity under the statute. What bars statutory immunity is the sum total of the factual allegations permitting a finding of gross negligence under the definition - not the particular choice of label given to the conduct by the plaintiff Accord Lynn v. O'Leary, 264 F. Supp. 2d 306, 311

-16-

(D. Md. 2003) (plaintiff alleged sufficient facts which, if true, could constitute gross
negligence).

Malice has been defined under Maryland law as "the intentional doing of a wrongful
act without legal justification or excuse." Elliott v. Kupferman, 58 Md. App. 510, 526, 473
A.2d 960, 969 (1984). "An act is malicious if it is done knowingly and deliberately, for an
improper motive and without legal justification." Id. Gross negligence has been defined
under Maryland law as "the omission of that care 'which even inattentive and thoughtless
men never fail to take of their own property,' it is a violation of good faith . . . . It implies
malice and evil intention.' . . . Gross negligence has been equated with 'wilful and wanton
misconduct,' a 'wanton or reckless disregard for human life or for the rights of others.'"
Wells v. State, 100 Md. App. 693, 702-03, 642 A.2d 879, 883-84 (1994) (internal citations
omitted). Maryland has also recognized a distinction between actual malice and "implied
malice" which has been defined as "'gross negligence' involving 'wanton or reckless
disregard.'" Montgomery Ward v. Wilson, 339 Md. 701, 729, 664 A.2d 916, 930 (1995).
Clearly, regardless of whether Defendant Stinnett's conduct can be labeled as constituting
actual malice, implied malice or gross negligence, he is not entitled to statutory immunity.

Gray has established sufficient facts which, if believed by a trier of fact, prove that
Stinnett acted with actual malice, implied malice, gross negligence, or a combination of all
three. See Lynn, supra. Specifically, the facts which support a finding of malice or gross
negligence on the part of Stinnett include (1) that Stinnett threatened Gray with the death
penalty - specifically the electric chair - saying he would "fry," "like a charcoal," in the
electric chair; (2) that Stinnett intimidated Gray and took advantage of his limited intelligence

-17-

and vulnerability; and (3) that Stinnett deprived Gray of food and sleep and used his deprived

state to coerce a confession out of him.  These acts constitute the essence of malice, that is,

"the intentional doing of a wrongful act without legal justification or excuse."  There can

never be any legal justification or excuse for threatening someone with the electric chair in

order to force them to confess - even if the person turns out to be GUILTY.   Elliott, 58 Md.

App. at 526, 473 A.2d at 969.  And, as the evidence reveals and as both the Plaintiff and the

Defendants' experts opine after reviewing the evidence,Gray was innocent.  Therefore, under

the facts of this case, statutory immunity is not available to Defendant Stinnett - or either of

the other two individual defendants for that matter.

## VI.    ARGUMENTS AGAINST SUMMARY JUDGMENT AS TO STATE LAW CLAIMS

### A.    Gray Has Established All Elements Of His Malicious Prosecution Claim Against Defendants Newcomer, Stinnett and Sheldon

The requisite elements of a claim for malicious prosecution are: 1) a criminal

proceeding instituted or continued by the defendant against the plaintiff; 2) without probable

cause; 3) with malice, or with a motive other than to bring the offenders to justice; and 4)

termination of the proceedings in favor of the plaintiff.  Heron v. Strader, 361 Md. 258, 264,

761 A.2d 56 (2000); Okwa v. Harper, 360 Md. 161, 183, 757 A.2d 118 (2000).  And the

element of "malice" may be inferred from an absence of probable cause.  Okwa, 360 Md.

188, 757 A.2d at 133.  Gray has established all elements of his malicious prosecution claim

against all Defendants.

Defendant Newcomer was the lead investigator in the Pellicano murder case.  Exhibit

4 at 110.  Defendant Stinnett, the Sheriff of Calvert County at the time, assisted Newcomer

-18-

with the investigation.  Defendants Newcomer and Stinnett arrested Gray without a  warrant

on the evening of June 20, 1991 and interrogated him off and on until approximately 4:00

a.m. June 21, 1991.  Throughout the course of the interrogation, Defendants Newcomer and

Stinnett, working together, did not advise Gray of his Constitutional rights, denied Gray his

right to an attorney, denied Gray the right to make a phone call to his family for the purpose

of getting an attorney, threatened Gray with the death penalty - specifically the electric chair,

intimidated Gray, took advantage of Gray's limited intelligence and vulnerability, deprived

Gray of food, deprived Gray of sleep, lied to Gray about the evidence, and lied to Gray about

the results of his polygraph.  These Constitutional violations by Newcomer and Stinnett

coerced Gray into confessing to a crime he did not commit.  Armed with Gray's June 21st

"confession," Newcomer made out an "Application for Statement of Charges/Statement of

Probable Cause" to detain Gray.  Exhibit 13 at 5.  Based on that false Application, the

judicial officer made a determination of probable cause to detain Gray as to "count I (murder)

only."  Based on the foregoing, Gray has established the first three elements of his malicious

prosecution claim against Newcomer and Stinnett, that specifically, they:  1) caused a legal

proceeding to be initiated or continued against Gray; 2) without probable cause; and 3) with

malice, or with a motive other than to bring the offenders to justice.  Heron, 361 Md. at 264,

761 A.2d 56; Okwa, 360 Md. at 183, 757 A.2d 118.  But Defendant Newcomer's

involvement did not end there.  He, together with Defendant Sheldon, participated in the

August 6, 1991 interrogation of Gray which led to Gray's most incriminating statement.

On August 6, 1991, Newcomer and Sheldon, working together, interrogated Gray.

They denied Gray his right to speak with an attorney, denied Gray his right to call his family

so he could get a lawyer, threatened and intimidated Gray by reminding him of what Stinnett

had told him, i.e., that he would "fry" in the electric chair if he did not confess, took

advantage of his limited intelligence and vulnerability, told him specific details of the crime

and the crime scene so that he would be able to make a convincing statement, and stopped

and started the tape repeatedly in order to coach Gray on what to say.   These Constitutional

violations by Newcomer and Sheldon coerced Gray into confessing to an even worse crime

he did not commit.  Based on the foregoing, Gray has established the first three elements of

his malicious prosecution claim against Sheldon as well as Newcomer, specifically, that they:

1) caused a legal proceeding to be initiated or continued against Gray; 2) without probable

cause; and 3) with malice, or with a motive other than to bring the offenders to justice.   Id.

  Gray ultimately pled guilty to counts I and II in exchange for the state withdrawing its

intention to seek the death penalty.  Gray was convicted of the Pellicano murder and rape and

sentenced to life in prison where he served seven and one half years.  Subsequently, another

investigation was undertaken, the true perpetrator was located, and he was tried and

convicted.  Gray's conviction was vacated and a nolle pros was entered in the case against

him.  See Exhibit 14 at 5.  Thus, Gray has established the forth element of his malicious

prosecution claim against Defendants Newcomer, Stinnett and Sheldon in that the

proceedings terminated in his favor.  Heron, 361 Md. at 264, 761 A.2d 56; Okwa, 360 Md. at

183, 757 A.2d 118.

  Defendant Newcomer attempts to escape responsibility by shifting it to the then-

State's Attorney for Calvert County, Warren Sengstack, Esquire.  Newcomer claims that he

relied on Sengstack's advice in making out his Application for Statement of Charges against

Gray. The problem with Newcomer's argument is that the information he gave Sengstack in "seeking his advice" was AFTER he had coerced a confession out of Gray. He then included that "confession" in his Application for Statement of Charges against Gray. See Exhibit 13. Accordingly, the "advice" Newcomer sought from attorney Sengstack could not have been in "good faith" and was not "after a full disclosure of the facts" within Newcomer's knowledge because it did not include the fact that Gray's "confession" had been obtained illegally. Gladding Chevrolet v. Fowler, 264 Md. 499, 509, 287 A.2d 280 (1972). Accordingly, Newcomer cannot rely on Sengstack's advice to escape liability for malicious prosecution.

Defendants also argue that Gray's conviction is a "conclusive determination of the existence of probable cause" at the time of his detention. See State of Maryland Memorandum at 20-21; Calvert County Memorandum at 20. This argument begs the question and is down right disingenuous. Conviction is only a conclusive determination of probable cause "if it was not obtained by fraud, perjury or other corrupt means." Zablonsky v. Perkins, 230 Md. 365, 368-69, 187 A.2d 314 (1963). The entire basis for Gray's lawsuit is that his conviction was obtained by "fraud, perjury or other corrupt means." For example, Defendant Newcomer, in the Application for Statement of Charges, included information that Gray had "confessed," however, he omitted the fact that Gray's "confession" was coerced. Thus, Newcomer's Application on which Gray was charged and held contained perjury. Further, Gray's second "confession" was, likewise, coerced. And it was the fact that he was coerced into confessing twice that led to his ultimate conviction. Thus, Gray has established ample factual evidence of police wrong-doing to submit this issue to the trier of fact. If the trier of fact finds that Gray's confessions were obtained by "fraud, perjury or other corrupt means,"

-21-

the fact that he was "convicted" does not bar his claim for malicious prosecution.  On the contrary, it would actually serve to strengthen his case against the Defendants for damages based on malicious prosecution.

> **B.    Gray Has Established All Elements Of His Claims Under Article 24 of the Maryland Declaration of Rights Against Defendants Newcomer, Stinnett and Sheldon**

Defendants have re-raised the same unsuccessful arguments with respect to Count IV, Gray's claim under Article 24 of the Maryland Declaration of Rights, that they raised in their Motion to Dismiss, with the addition of a statute of limitations argument.  This Court denied their previous motion with respect to Count IV and there is no reason for the Court to reverse its decision now.

Article 24 provides:

> That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

By its plain language, Article 24 protects a man from unlawful seizures of his person and unlawful deprivations of his liberty.  Defendants argument that Gray's allegations of wrongful arrest, detention, interrogation, prosecution and incarceration do not implicate Article 24 are wrong.  As this Court pointed out in its September 18, 2002 Reported Opinion in the instant case, "Article 24 is in pari materia with the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution with respect to issues dealing with deprivation of life, liberty, or property. . . ."  Gray v. State of Maryland, 228 F. Supp. 2d 628, 638, n.5 (D. Md. 2002) (citing Widgeon v. Eastern Shore Hosp. Ctr., 300 Md. 520, 479 A.2d 921, 927-28 (1984)).  This Court also correctly

recognized that "to hold someone without probable cause is a violation of the Fourth

Amendment."    Id, at 638.  Gray has set forth sufficient facts to establish, at this stage of the

proceedings, that he was deprived of his liberty for seven and one half years without probable

cause and outside of the "Law of the Land."  Because he filed suit within three years of his

release from prison, his claim under Article 24 is not time barred.

　　　　In addition, Defendants argue that Gray is alleging "a lack of 'insufficient evidence' (*sic*)

or probable cause" and, therefore, his claims arise only "under the Fourth Amendment or

Maryland's equivalent, Article 26."  See Defendants State of Maryland, et al. Memorandum at

25.  Defendants read Gray's Complaint too narrowly.  Notwithstanding the holding of the Court

of Appeals of Maryland in Widgeon, *supra*, that Article 24 is in pari materia with the Fourth,

Fifth, and Fourteenth Amendments, Gray has alleged violations under the Fourteenth

Amendment and the Fifth Amendment in addition to violations under the Fourth Amendment.

　　　　Specifically, Count V of Gray's Amended Complaint contains an express claim under the

Fourteenth Amendment and was only dismissed because there is no direct private cause of action

to enforce violations of the Fourteenth Amendment.  The factual underpinnings of this Count,

however, stand.  Enforcement under the Fourteenth Amendment is provided through 42 U.S.C. §

1983 which is pled Count VII of the Amended Complaint.  Jett, 491 U.S. at 722-24 (stating that §

1983 was enacted as "An Act to Enforce the Provisions of the Fourteenth Amendment to the

Constitution of the United States and For Other Purposes").  As stated in paragraphs 76 through

79 in Count V of the Amended Complaint:

> The Fourteenth Amendment of the United States Constitution, in
> pertinent part, prohibits States from depriving "any person of life,
> liberty, or property, without due process of law. . . ."  The actions

taken by the Defendants, separately and collectively and conducted under color of State law, as described hereinabove, amount to a violation of Gray's rights under the Fourteenth Amendment of the United States Constitution. The Defendants acted outside the scope of their jurisdiction and without authorization of law, and each of the Defendants acted wilfully, knowingly and purposefully with the specific intent to deprive Gray of his life, liberty and property without due process of law. In arresting, detaining, interrogating, charging and incarcerating Gray, Defendants knew or should have known that they were violating Gray's constitutional rights. . . ."

Likewise, Count VI of the Amended Complaint contains an express claim under the Fifth Amendment and was only dismissed because there is no direct private cause of action to enforce violations of the Fifth Amendment. The factual underpinnings of this Count also remain. As stated in paragraphs 83 through 86 in Count V of the Amended Complaint:

The Fifth Amendment of the U.S. Constitution states, in pertinent part, that "[n]o person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ." The actions taken by the Defendants, separately and collectively and conducted under color of State law, as described hereinabove, amount to a violation of Gray's rights under the Fifth Amendment of the United States Constitution. The Defendants acted outside the scope of their jurisdiction and without authorization of law, and each of the Defendants acted wilfully, knowingly and purposefully with the specific intent to deprive Gray of his life, liberty and property without due process of law. The manner and circumstances under which Defendants interrogated Gray amounted to discriminatory, coercive and unlawful tactics. In arresting, detaining, coercing, interrogating, charging and incarcerating Gray, Defendants knew or should have known that they were violating Gray's constitutional rights.

The sum total of the factual allegations in Gray's Amended Complaint, together with the rights on which they stand and the evidence on which they are based, make clear that Gray complains not only of his pre-trial detention, but also of his wrongful conviction and his post-conviction

-24-

detention, all of which stemmed from the combine wrongdoing of the Defendants in violation of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Accordingly, Gray has stated a viable claim under Article 24 of the Maryland Declaration of Rights even if Article 24 implicates only rights protected under the Fourteenth Amendment to the United States Constitution. Therefore, Gray has a viable private right of action against the Defendants under Article 24 regardless of the United States Constitutional provisions on which it is modeled. Widgeon, 300 Md. at 531-33, 479 A.2d at 926-28.

### C. Defendant Stinnett, as Sheriff of Calvert County, was a State Employee, Not A County Employee; The Local Government Tort Claims Act is Inapplicable; Calvert County Is Not Vicariously Liable Under State Law

Plaintiff Gray concedes, for purposes of the state law claims, that, as Sheriff of Calvert County, Defendant Stinnett was a State official or employee as opposed to a county official or employee. See Rucker v. Harford County, 316 Md. 275, 280-81, 558 A.2d 399, 401-02 (1989); Boyer v. State, 323 Md. 558, 572, 594 A.2d 121, 128 (1991). Therefore, the Local Government Tort Claims Act does not apply since Calvert County cannot be held vicariously liable for acts of the Calvert County Sheriff with respect to Gray's state law claims in any event. Gray, therefore, concedes that Count I and Count IV against Calvert County must be dismissed.

### VII. ARGUMENTS OPPOSING SUMMARY JUDGMENT AS TO REMAINING FEDERAL CLAIM UNDER 42 U.S.C. § 1983

#### A. Gray Has Established All Elements Of His Claims Under 42 U.S.C. § 1983

Gray's claim under 42 U.S.C. § 1983 is "analogous" to a common law malicious prosecution claim. Lambert v. Williams, 223 F.3d 257, 261-62 (4th Cir. 2000) (citing Brooks v. City of Winston-Salem, 85 F.3d 178 (4th Cir. 1996) for the proposition that a claim under 42

U.S.C. § 1983 is "a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution").  See also, Heck v. Humphrey, 512 U.S. 477, 483-84 (1994) (legality of confinement claim under 42 U.S.C. § 1983 is analogous to the common law tort of malicious prosecution which requires the termination of the criminal proceeding in favor of the plaintiff).  As stated above, the elements of malicious prosecution are: 1) a criminal proceeding instituted or continued by the defendant against the plaintiff; 2) without probable cause; 3) with malice, or with a motive other than to bring the offenders to justice; and 4) termination of the proceedings in favor of the plaintiff.  Heron, 361 Md. at 264, 761 A.2d at 59; Okwa, 360 Md. at 183, 757 A.2d at 130.  While a plaintiff must prove elements 1, 2, and 4 in a malicious prosecution type case brought under § 1983, he need not prove the third element required in the common law cause of action - malice.  The Supreme Court has stated that the reasonableness of a seizure under the Fourth Amendment should be analyzed from an objective perspective.  Brooks, 85 F.3d at 184 n. 5 (citing Graham v. Connor, 490 U.S. 386, 396-97, 399 (1989)  "subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry").

In Section VI.A herein above, Gray set forth his arguments in support of his common law malicious prosecution claim against all three individual Defendants, Newcomer, Stinnett and Sheldon.  Those same arguments apply here.

First, as explained in detail in Section VI.A above, Defendants Newcomer and Stinnett initiated a criminal proceeding against Gray in that they BOTH coerced a confession out of him which was then used in Newcomer's Application for Statement of Charges/Statement of Probable Cause.  Although Defendant Stinnett did not personally sign the Application for Statement of Charges, he cannot seriously deny that his "contribution" in obtaining Gray's

-26-

"confession" was invaluable. As the evidence produced thus far demonstrates, Stinnett's role in Gray's prosecution was substantial in that his threats contributed enormously to Gray's initial coerced confession and the resulting charge of murder being filed against him. No one could argue that the inclusion of Gray's "confession" in the Application for Statement of Charges played no part in the judicial officer's determination of probable cause which authorized Gray's continuing detention and prosecution. But Stinnett's conduct had an additional longer term effect on Gray in that his threats of the electric chair were on Gray's mind and were referenced by Defendants Newcomer and Sheldon during the August 6th interrogation which led to Gray's second coerced confession. Thus, Stinnett's arguments attempting to minimize his role in Gray's prosecution, after what he did, are not persuasive.

Likewise, Defendant Sheldon claims that he did not "initiate" the prosecution against Gray in that his role was limited to the August 6th interrogation. While it is true that Sheldon did not "initiate" the prosecution, he "continued" it by participating in an illegal interrogation which resulted in Gray making another, even more incriminating, coerced confession. See Heron, 361 Md. at 264, 761 A.2d 56 (the first element of malicious prosecution can be initiating or *continuing* a prosecution against the accused). That second confession resulted in additional charges being filed against Gray and in his ultimate conviction of murder and rape. Sheldon's arguments attempting to minimize his role in Gray's prosecution are, likewise, unpersuasive.

Second, Defendant Newcomer argues that he relied on the advice of then State's Attorney Warren Sengstack, in proceeding to apply for charges against Gray. As stated above, because the facts provided to Sengstack included Gray's coerced confession, Newcomer is not sheltered by any advice he received by Sengstack to proceed. Gladding Chevrolet, 264 Md. at 509, 287 A.2d 280.

-27-

Third, Defendants Newcomer, Stinnett and Sheldon argue that, because Gray was convicted, he cannot now claim that his prosecution was based on a lack of probable cause. Again, Defendants fail to point out the one exception to the general rule which applies to this case. Conviction is only a conclusive determination of probable cause "if it was not obtained by fraud, perjury or other corrupt means." Zablonsky, 230 Md. at 368-69, 187 A.2d 314. Here, because Defendants' use of death threats and other draconian measures in eliciting the confessions from Gray led to his conviction, his conviction was obtained by "fraud, perjury and other corrupt means." Therefore, the general rule does not apply in this case and Gray's § 1983 claim against the Defendants must stand.

## VIII.  CONCLUSION

Based on the foregoing disputes of material fact and inferences drawn therefrom, facts supporting Anthony Gray's claims, and arguments, Plaintiff Anthony Gray requests that this Honorable Court Deny Defendants' Motions for Summary Judgment consistent with the arguments set forth herein.

Respectfully submitted,

*Kathleen Duckett McCann*

Kathleen Duckett McCann
Federal Bar No.:  25332
Alan Hilliard Legum
ALAN HILLIARD LEGUM, P.A.
275 West Street, Ste. 305
Annapolis, Maryland 21401
410-263-3001

Joel L. Katz
JOEL L. KATZ, L.L.C.
2060 West Street
Annapolis, Maryland   21401
410-841-5333

-28-