# EXHIBIT 9

**Maryland State Police SUPPLEMENT REPORT**

| VICTIM, COMPLAINANT, MISSING PERSON OR ARRESTEE (LAST, FIRST, MIDDLE) | COMPLAINT CONTROL NO. |
|---|---|
| PELLICANO, Linda Mae | CIR W 8 3 0 3 3 8 2 |

| INCIDENT, OFFENSE OR CHARGE ON ORIGINAL REPORT | CORRECT INCIDENT OR OFFENSE CLASS | CHANGED? | MULTIPLE CLEAR-UP |
|---|---|---|---|
| HOMICIDE | | ☐ YES | ☐ YES ☐ NO |

## NARRATIVE

(6)

NARRATIVE: On May 13, 1991, at 1610 hours, I arrived at the Pellicano residence, 3610 Dalrymple Road, Chesapeake Beach, Maryland. Upon my arrival, Sergeant Linger, Trooper Fisher, along with Mr. Ronald Morris, who is an EMT from the North Beach Volunteer Fire Department, were already on the scene. Sergeant Linger advised that he and Trooper Fisher had arrived approximately three minutes after Mr. Morris had arrived. Mr. Morris had approached the residence, and yelled inside the residence, and he did not received an answer, so he did not enter the residence.

Sergeant Linger and Trooper Fisher entered the residence and secured the residence by conducting a room to room search to make sure there was no individuals within the residence. At that time, they exited the residence and awaited for my arrival.

Sergeant Linger advised that he entered the residence with Mr. Morris and Mr. Morris checked for a carotid pulse on the victim, and determined that the victim had no heartbeat and was deceased. At this time, they exited the residence and secured it, and I waited outside the residence until approximately 1710 hours when Trooper Randy Tarburton from the Evidence Collection Unit arrived at the scene.

After Sergeant Linger and the other uniformed Troopers on the scene determined that the victim's 1988 Ford Escort 2 door, Maryland registration RYW 577, dark blue in color, was missing from the residence, a broadcast was given at approximately 1600 hours notifying

| Crime Prevention Action Initiated? ☐ Yes ☐ No | 46. Previous Crime Prevention Survey ☐ Yes ☐ No | 47. Date Supplemental Report Due |
|---|---|---|
| Initial Status ☐ Open ☐ Suspended ☐ Unfounded ☐ Closed | 49. Initial Investigator  TFC B. C. Newcomer | I.D. Number 2416  50. Date 6-26-91 |
| Supervisor Status ☐ Agree ☐ Disagree | 52. Recommended To Continue ☐ Patrol ☐ Suspend ☐ Investigation | 53. Reviewing Supervisor | I.D. Number | 54. Date |
| Investigation Supervisor Status ☐ Patrol ☐ Investigative | 56. Investigation Supervisor | I.D. No. | 57. Date | 58. Assigned Investigator | 59. Date |
| ☐ NCIC Entered ☐ NCIC Cleared  ☐ Miles Entered ☐ Miles Cleared | 61. Final Status (Check One) ☐ Open ☐ Suspended ☐ Closed | 62. Classification (Office Use) | 63. UCR Disp. | 64. Page 1 of 22 |
| Crime Analysis: | Victim Witness | 65. Related Report Numbers |

units in the area to attempt to locate the vehicle.

At 1650 hours, Lieutenant W. S. Freeland of the Calvert County Sheriff's Department, located the victim's vehicle abandoned near a back entrance to the Upper Bennett Farm, which is 1.3 miles north of the victim's residence on Old Bayside Road. The vehicle was driven, front first, into a tall area of weeds and it was right against a cattle gate that blocked the entrance to the field.

The immediate area was searched, and a bloodhound was obtained from the Charles County Sheriff's Department. He was able to initiate a track that started from the location of the car, across the field, in a eastward direction towards the development on 10th Street, where the trail was ended.

Corporal Thompson from the Charles County Sheriff's Department, was the K-9 handler that initiated the track. According to Corporal Thompson, the K-9 travelled approximately 700 yards into the field, and circled after travelling in a eastward direction towards the development on 10th Street. It appeared at that time, the track was getting weaker and the dog had lost the scent. After the dog began circling, the track was discontinued.

Trooper Tarburton and I checked the exterior of the residence, while Trooper Tarburton photographed the residence. We went to the rear of the residence, where entry was gained by a bedroom window at the north end of the window. The bedroom belonged to that of Robin Pellicano, the victim's daughter. After Trooper Tarburton photographed the exterior of the residence, he and I entered the residence and at that time, we noticed that there was no power inside the residence, and it appeared that either a fuse or a circuit breaker had been tripped. Trooper Tarburton and I exited the residence and we checked for the main power source going into the north end of the residence, and we found

that the main switch supplying power to the residence, had been tripped and it was in the off position. At that time, we turned the switch to the on position and re-entered the house.

Upon entering the house, we noticed that the electric range in the kitchen had all four burners on high, and the door to the oven was open. The kitchen was slightly disarrayed and we noticed that there were two plastic grocery bags on the floor near the side entrance. There was also one grocery bag on the dining room table, along with the contents of the victim's purse, which appeared to have been dumped on the table. The purse was laying on the floor adjacent to the table in the kitchen-dining room area.

The victim's body was lying in the hallway, positioned with her head facing the dining room kitchen area, and her feet facing the bedroom area. The victim had a white plastic bag, similar to the grocery type bag, pulled all the way over her head, and it was tightly knotted at the throat. The victim was lying on her back, and her hands were bound behind her, using a pinkish colored belt from what appeared to be a bathrobe. What appeared to be ladies panty hose were wrapped one time around her neck and connected down to where her hands were bound with the bathrobe belt. A man's brown colored necktie was blindfolded over the victim's eyes, and trailed down her back, and was connected to where her hands were tied with the bathrobe belt. A yellow section of telephone cord was tied one time tightly around her neck. The telephone cord appeared to be the one from the receiver which was hanging on the kitchen wall. The victim had what appeared to be a white sock in her mouth, which appeared to be used as a gag. The victim's clothing consisted of a white long sleeve shirt, which was rolled up on each arm just below the elbow. The shirt had a small blood stain approximately three inches in diameter over her left breast. The victim

was also wearing a pair of blue jeans. The jeans were pulled completely off of her right leg, and one leg of the jeans, along with her underwear, were still on her left leg. The victim's tennis shoe and sock had been removed from her right leg and foot, and the tennis shoe was approximately four feet from her body in the hallway. The victim's legs were positioned and parted in a way that indicated access may have been gained to her genital area for a sexual assault.

One wooden handled kitchen knife, approximately seven (7) inches in length, with a serrated blade was observed in a clothes basket on a chair at the entrance to the hallway adjoining the dining room. The blade of the knife was bent at a forty five (45) degree angle, and on one side of the blade, there was a small smear of blood. Another kitchen knife, approximately nine (9) inches in length, blade length, was located approximately one foot from the victim's right hand. The blade of the knife was completely covered in blood indicating that it had been completed inserted into her chest cavity. The knife was laying just outside of the threshold entrance to the bathroom.

* 4:10 Upon my arrival, the victim's body was cool, and rigor mortis had began from the neck and shoulder area, but her limbs were still movable. Lividity was clearly present in the victim's body on the backs of her legs, her buttock area, her back and her hands.

The victim's bedroom was the first bedroom on the left going down the hallway. That room showed signs of ransacking. There was two drawers from the victim's dresser which were dumped upside-down on the bed. The contents of the drawers appeared to be underclothing and several men's ties.

The victim's daughter's bedroom is the bedroom on the right at the end of the hallway. The window was open approximately twelve inches, and the screen had been removed from the outside.

The victim's son's room was very undisturbed. The closet doors were open, but there appeared to be little sign of disarray in that room.

At the end of the hallway between the victim's son's room and the victim's daughter's room, there was a piece of wooden stick which was approximately 20 to 24 inches in length. The stick had a very rough cut to it, and appeared to be half of a tobacco stick, or something similar.

The screen belonging to the window at the point of entry was located by me, approximately thirty five feet to the north side of the house, about five feet into the woods behind a large tree. The screen appeared to be folded and placed in that area as opposed to being just dropped on the ground.

The victim's purse was located on the floor in the dining room area. The purse had been dumped, with the contents left on the dining room table. One small zipper compartment in the purse contained forty five dollars ($45.00) in cash.

After contacting the victim's husband, Michael Pellicano, the only items that appeared to have been removed from the residence are one set of car keys belonging to the victim's 1988 Ford Escort, and a checkbook from a checking account in both their names at Calvert Bank and Trust Company, Chesapeake Beach branch.

Further investigation revealed that there was a metal skillet, approximately one-third filled with bacon grease on the rear burner on the right side of the electric range. The bacon grease had been used to prepare a breakfast on Sunday morning, and apparently the victim did not have time to do the dishes and put the bacon grease in the can after they left and went to the victim's mother's house in Brentwood, Prince George's County. This information was verified by Robin Pellicano at