# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Civil Action No.: CCB-02-CV-385

ANTHONY GRAY,

        Plaintiff,

vs.

STATE OF MARYLAND, et al.,

        Defendants.

_____/

**CERTIFIED COPY**

DEPOSITION OF DR. GEORGE KIRKHAM, A WITNESS,
TAKEN BY THE DEFENDANTS.

DATE:  August 7, 2003

TIME:  11:30 a.m. - 2:16 p.m.

*Everman & Everman*
1101 North Olive Avenue
West Palm Beach, FL 33401
(561)659-7444

ANTHONY GRAY vs. STATE OF MARYLAND, et al.
Deposition of Dr. George Kirkham
August 7, 2003

SHEET 9 PAGE 30

**30**

1  videotapes, criminal trial transcripts that are
2  pertinent, any fact witness statements, just anything at
3  all that bears on it.
4      Q.  Well, let's start with what you have reviewed.
5      A.  Sure.
6      Q.  What have you reviewed?  It looks like you were
7  sent the complaint; Mr. Gray's deposition; answers to
8  interrogatories by the State of Maryland, Sheldon,
9  Stinnett, Newcomer; plaintiff's answers to
10 interrogatories and response to request for production of
11 documents; medical report of Dr. Patrick Sheehan; and a
12 recorded interview of Anthony Gray.
13     A.  Right.  I have my complete file, you're welcome
14 to inspect it if you like.
15         MR. KATZ:  Objection.  But you can look at it.
16         Let the record indicate the file was given to
17     counsel, but there was no subpoena duces tecum for
18     production filed.
19 BY MR. KARPINSKI:
20     Q.  Doctor, it looks like you were sent some
21 material under a letter dated April 7th, 2003, and then
22 at some point at a later date it appears that you were
23 sent additional documents.  Is that correct?
24     A.  Yes, I think that's probably true.
25     Q.  At the time you prepared your report, it looks

Everman & Everman, Inc.

PAGE 31

**31**

1  like you had the complaint, Mr. Gray's deposition,
2  answers to interrogatories of the parties, the medical
3  report of Dr. Sheehan, and a recorded interview of
4  Anthony Gray.  Correct?
5      A.  That would probably be correct, yes.
6      Q.  You did not have the depositions of any of the
7  defendants.  Correct?
8      A.  Stinnett and Newcomer, that's correct.
9      Q.  Or Sheldon?
10     A.  Or Sheldon, that's correct.
11     Q.  And it doesn't appear that you had any of the
12 case file at that time either.
13     A.  I think we can only reconstruct from what we've
14 got there in terms of the things I actually had.
15     Q.  Did you request additional information, or Mr.
16 Katz or Mr. Legum forward you additional information at
17 some later point?
18     A.  Well, again, I've had conversations with them, I
19 think my associate Pete Fenton has, and I don't, I don't
20 know specifically, I can't recall specifically what we
21 requested.  We would have discussed early on the types of
22 documents that I wanted, but I can't, again, I can't tell
23 you what Fenton's conversation was with them.
24     Q.  Who is Mr. Fenton?
25     A.  Pete is, Fenton is a former police officer,

Everman & Everman, Inc.

PAGE 32

**32**

1  criminologist and former metro police legal counsel who
2  has worked with me as an associate for about eight years
3  now.  He does most of my research, initial case workup,
4  that kind of thing.
5      Q.  What's been his role in case?
6      A.  To go through it -- initially, when I'm retained
7  in a case, to take a look at it and give me a heads up as
8  to what the issues are.  If we need additional discovery,
9  I would usually put him in touch with the attorney client
10 and let them talk lawyer to lawyer and be sure that
11 everything gets gotten that needs to be.  He'll also help
12 in structuring discovery depositions very often, and
13 things of that sort.
14     Q.  And would it be fair to say that this letter of
15 August 1, where Mr. Fenton was sent additional material
16 from Mr. Katz, you have no understanding of what
17 generated Mr. Katz's letter of August 1 enclosing a whole
18 slew of additional documents for your review?
19         MR. KATZ:  Emphasis on slew.
20     A.  No, I don't, I don't know the, the specific
21 conversation that they had or what specifically
22 precipitated this additional documentation.
23 BY MR. KARPINSKI:
24     Q.  And on how many occasions have you spoken with
25 Mr. Katz about this case?

Everman & Everman, Inc.

PAGE 33

**33**

1      A.  I think you may have asked me that earlier.
2  I've had, I think a couple of conversations with Mr.
3  Katz, and some with, maybe one or two with Mr. Legum, but
4  talking as I do to the number of attorneys I do each
5  week, it's difficult for me to remember specifically.
6      Q.  Did you meet with Mr. Katz prior to your
7  deposition today?
8      A.  Yes, I did.
9      Q.  And what did you discuss with Mr. Katz?
10     A.  Well, we discussed, I gave him a thumbnail
11 sketch of my, you know, my basic feelings and thoughts
12 about material I've been through, we discussed some --
13     Q.  What was the thumbnail sketch that you gave?
14     A.  That I, I told him that it was --
15         MR. KATZ:  I'm going to object, but you can
16     answer.
17     A.  Yeah, I told that I had never seen anything this
18 egregious, I think was the term I used, in terms of
19 police investigative procedure violations, and that it
20 was shocking and I, you know, that was the gist of my --
21 I told him that it personally upset me and I don't get
22 upset by cases, I've been doing this for a very long
23 time, but the sheer number, in construing the facts of
24 the case in the light most favorable to the involved
25 officers, there were things that were just staggering to

Everman & Everman, Inc.

D. Linda Minor, RPR
Everman & Everman, Inc.
1101 North Olive Avenue, West Palm Beach, Florida  33401

Case 1:02-cv-00385-CCB   Document 59-9   Filed 01/29/2004   Page 4 of 7

ANTHONY GRAY vs. STATE OF MARYLAND, et al.
Deposition of Dr. George Kirkham
August 7, 2003

SHEET 10   PAGE 34

34

1  me, and I can tip them off to if you would like.
2      Q.   Sure.
3      A.   Okay, the first, there are a number of -- I can
4  tell you also the things that were done correctly.
5  That's my job is really to try calling everything as I
6  see it.
7            I have no criticism of the initial involvement
8  of law enforcement authorities in this case. For
9  example, the picking up of Mr. Gray at his residence
10 after he had apparently been identified, albeit
11 differently, by Holland and Long as having been involved,
12 and the knowledge that the law enforcement personnel
13 would have had that he had a history, albeit a minor
14 history, of breaking and entering and had been in the
15 area, in the area, I think it was reasonable for them,
16 given the severity of the crime, for them to pick him up
17 and bring him in for questioning. It is after that that
18 we begin to have serious problems, and this is what
19 these -- these are they, basically.
20           First, I would represent to you as someone who
21 is familiar with investigative protocols as they're
22 practiced throughout the United States in law enforcement
23 agencies and memorialized in various texts and articles
24 in criminal investigation, there are certain things that
25 are done and certain things that are, that are not done.

Everman & Everman, Inc.

PAGE 35

35

1           First, it is imperative, as we all know, that a
2  person, once a case moves from investigatory to
3  accusatory, as it clearly did during this interview on
4  the 20th or 21st, that a defendant, an accused be
5  apprised of their Miranda warnings, of course including
6  their right to counsel. And here we, and I tried very,
7  very hard to stay out of the problems of the trier of
8  fact, the experts can tell you I believe this or I
9  believe that, but there are certain deductions that seem
10 to be pretty clear about certain things, but we have Mr.
11 Gray saying that he had asked repeatedly for an attorney
12 during this interrogation, and we have the police saying
13 we offered him an attorney, gave him his Miranda
14 warnings, so there's no, there's no signed waiver,
15 Miranda waiver from that initial interview, and that's,
16 that's very unusual in something this grave, as is the
17 lack of any recording of something this serious. We're
18 sort of in a Rosemary Woods tape thing here. We've got a
19 little bit of a transcript from his, quote, "confession",
20 but we have all this period of time from about four
21 o'clock in the afternoon, or six o'clock in the afternoon
22 till four o'clock the following morning. Admittedly, he
23 was in a holding cell some of that time, some of the time
24 he was being polygraphed, but we have no, we have no
25 record of, no visual record, no auditory record of what

Everman & Everman, Inc.

PAGE 36

36

1  was being done and said, and that's strange given the
2  gravity of the case and what is normally done in an
3  interview of this, or interrogation of this nature.
4            We don't know -- we have, for example, we have
5  Mr. Gray saying that he was threatened with execution in
6  the electric chair, and noises were made, he was told
7  that he would be fried like charcoal in his version. We
8  don't know if that, we have no way of knowing exactly
9  what was said, what the interrogators' body language,
10 demeanor was. Were they shaking their fists? Were they
11 raising their voice?
12           The failure to record this is all the more
13 curious given the fact that the police would realize that
14 the burden of showing that this was an intelligent,
15 knowing waiver of rights in the gravest matter we can
16 imagine, the burden of showing that that was done would
17 be on the prosecution. That's strange.
18           It is also very curious, and again, that's
19 something to leave for a jury, why someone under, under
20 such a grave situation, if in fact he were offered an
21 attorney and told that if he could not afford one, one
22 would be provided for him and he could stop the
23 questioning at any time, why he would elect not to do
24 that, and why he would continue talking in a circumstance
25 where we know, we must assume, given the totality of the

Everman & Everman, Inc.

PAGE 37

37

1  evidence, that he did not attack this woman, didn't
2  burglarize her house, didn't rape her, didn't kill her,
3  why would he -- it's a rhetorical question, I know I
4  don't get to ask questions -- but why would he do that?
5            There are some other things, too, just --
6      Q.   People do do things like that, though. I mean,
7  people do incredibly stupid things.
8      A.   Well, and you raise an interesting point.
9      Q.   For example, people, police officers all the
10 time say may I consent to search your car, and the person
11 thinks, go ahead and search it, even though the person
12 knows they have drugs or weapons or something in their
13 car.
14      MR. KATZ:   Did you want him to finish his
15 thumbnail, or did you want to go on?
16      MR. KARPINSKI:   He's doing just fine, Mr. Katz.
17      A.   And of course, in the example you raised, and
18 it's an interesting example, courts have made very clear
19 in terms of the establishment of a coercive atmosphere,
20 it's one thing if I say sure, go ahead and look in my car
21 and I've got things in it, and it's another thing if you
22 intimidate, frighten and threaten me that may lead me to
23 do that, but because -- your point's well taken --
24 because of the fact people do, people confess out of
25 guilt of things that they haven't done, people do all

Everman & Everman, Inc.

ANTHONY GRAY vs. STATE OF MARYLAND, et al.
Case 1:02-cv-00385-CCB   Document 59-9   Filed 01/29/2004   Page 5 of 7
Deposition of Dr. George Kirkham
August 7, 2003

SHEET 11 PAGE 38

**38**

kinds of strange things, it would be all the more important for the police, and this goes to standard police investigative procedure, I would represent to you, for the police to competently, minimally, to competently investigate other aspects of this crime. The confession itself is not enough. There must be independent corroborating evidence, and we've got a plethora of evidence here, we've got alibi witnesses, that would have, would have blown, I mean, that would have been the end right there. Holland was 20 miles away, couldn't have been involved in this. We've got incredible forensics evidence, we've got DNA, wonder of the modern age, deoxyribonucleic acid, doesn't match, doesn't match these guys, they couldn't have had sex, none of them could have had sex with this woman.

We've got an averment, the representations of Gray changed at different points in time, but we've got him saying in the August version, which we'll get to in a moment, which is really interesting, for the first time now he begins to provide what police call discreet information, things that only could be known to the killer or accomplice, or to the police. And we must ask ourselves -- and he changes his story at various times. Well, we must ask ourselves how did he acquire this information? How would he know what her panties looked

Everman & Everman, Inc.

PAGE 39

**39**

like, what her pubic hair configuration was like, what her nipples looked like? How would he know the layout of the house if he wasn't involved in the crime? We know that he wasn't involved in the crime, and the answer must be that that information came from the police, it was given by the police to him and became part of his subsequent confession.

There are physical things that are just clamorous. The description he gives in August of the stabbing of Ms. Pellicano and the subsequent rape would lead me to conclude, having looked at lots of homicide cases, that there would be, I mean, beaucoups fingerprints. They must have blue fumed the body for prints. There would be evidence of blood transfer, there would be evidence all over the place, and yet curiously, in the processing of the crime scene, the body, the house, the car, not a single latent print that matches any of these guys, no fiber evidence, nothing.

Alibi witnesses who, as we said, were never interviewed. So those things are all the more, I mean, they shock the conscience, frankly, that these things were not followed up on.

The interrogation conditions, another thing that was a serious violation. You know, I, as you can imagine, I'm a pretty experienced deponent, I've probably

Everman & Everman, Inc.

PAGE 40

**40**

1  given a thousand depositions, but do you think I'd want
2  you guys asking me questions here about anything of
3  importance, let alone of something of life or death at
4  one o'clock in the morning, two o'clock in the morning?
5  Ten o'clock my eyes start to droop, like a lot of people,
6  and we've got this interrogation going on. Officer
7  Newcomer says he doesn't know when he last slept, that is
8  when Mr. Gray last slept, if he had anything to eat,
9  didn't think that that was really important. We're into
10 some pretty draconian conditions of interrogation.
11       So, you know, these are things that any, how
12 could -- rhetorical question again -- how could any
13 reasonably competent investigator have not looked at this
14 other evidence, how could they have disattended something
15 like the letter that came from Fleming saying I know
16 things about the crime?
17 BY MR. KARPINSKI:
18    Q.   Who was that letter sent to?
19    A.   It was sent to the State's Attorney's office, I
20 believe. But, I mean, once the police become privy to
21 that, how could they not follow up on that?
22    Q.   What's the basis for your belief that they were
23 privy to it?
24    A.   I would assume that, once the prosecutor
25 received that, that either the relevant law enforcement

Everman & Everman, Inc.

PAGE 41

**41**

1  personnel would be told, or in the course of what should
2  be an aggressive investigation on their own, they would
3  do diligent discovery.
4     Q.   Do you recall anything in the records that you
5  reviewed that would suggest that any of the named
6  defendants in this case were provided a copy or given
7  information regarding the letter that was sent to the
8  State's Attorney?
9     A.   I don't recall anything specific, and again,
10 I've asked Mr. Katz to provide me with anything that will
11 elucidate this.
12    Q.   What's your understanding of the role that
13 Deputy Newcomer played in this investigation from the
14 date of the murder until June 19th or 20th of 1991?
15       MR. KATZ:  I don't think Newcomer is a deputy.
16    A.   Yeah, he was a state police, he identified
17 himself as the lead investigator in the case, and by that
18 definition he would have the principal responsibility for
19 coordinating the investigation and making certain that
20 the minimal things that were, you know, that should be
21 done were done, like things, for example, such as -- by
22 the way, we had an equivocal polygraph, which should have
23 been followed up on subsequently. Sheldon did not --
24 BY MR. KARPINSKI:
25    Q.   Let's take it one by one.

Everman & Everman, Inc.

ANTHONY GRAY vs. STATE OF MARYLAND, et al.
Case 1:02-cv-00385-CCB   Document 59-9   Filed 01/29/2004   Page 6 of 7
Deposition of Dr. George Kirkham
August 7, 2003

SHEET 12 PAGE 42

**42**

```
 1   A.  Okay.
 2   Q.  Tell me what your understanding is of what
 3 Trooper Newcomer did from the date of the murder until
 4 June 19, 1991, when Mr. Gray made his first statement.
 5   A.  Well, most, most pertinent, he was involved in
 6 the, the initial and subsequent questioning of Mr. Gray
 7 when he became a suspect.
 8   Q.  I understand that, but do you have any
 9 understanding of what occurred prior to the date that Mr.
10 Gray was questioned on June 19?
11   A.  In terms of what Mr. Newcomer's activities were?
12   Q.  Sure, sure.
13   A.  I know that, and I presume he was involved in
14 this and I said I had no criticism of this, I presume
15 that he was involved in gathering information, the road
16 block information that identified Gray as a possible
17 suspect, the criminal history on Gray that was run.  I
18 presume he was involved in the interviews of Long and
19 Holland.
20   Q.  But you don't know that because you haven't been
21 provided the case file that would track what he did from
22 the date of the murder until June 19, 1991, when Gray was
23 picked up.  Is that fair to say?
24   A.  That's correct.  That's a hole in the
25 information I have and one that I would like to fill, but
```

Everman & Everman, Inc.

PAGE 43

**43**

```
 1 I think that I have, I have here, I have an abundant
 2 predicate to talk about the things that I'm talking about
 3 here as far as --
 4   Q.  Okay, would the same be true for Sheriff
 5 Stinnett, you have no information because it hasn't been
 6 provided to you regarding what if any participation
 7 Stinnett had from the date of the murder until June 19,
 8 1991, when Mr. Gray was picked up?
 9   A.  That's also a fair statement, yes.
10   Q.  And would it be fair to say that you have no
11 information or knowledge as to what if any role Sheldon
12 played in this investigation from the date of the murder
13 until the second statement, which was provided in August
14 of 1991?
15   A.  That's also correct.
16   Q.  And do you have an understanding of what role if
17 any Stinnett played from the time after Mr. Gray gave his
18 first statement until Mr. Gray pled guilty in front of
19 Judge Rymer in the circuit court for Calvert county?
20   A.  I don't know what if any, during those two, two
21 months or so of incarceration, kind of incommunicado
22 without an attorney, I don't know what Stinnett did
23 during that time.
24   Q.  You have no information that in fact he had any
25 involvement with Gray during that period from after the
```

Everman & Everman, Inc.

PAGE 44

**44**

```
 1 first statement until he pled guilty in front of Judge
 2 Rymer?
 3   A.  Yeah, that's true, I don't know what, what if
 4 any involvement --
 5   Q.  And what's your understanding of what role
 6 Trooper Newcomer had between the first statement that was
 7 given by Mr. Gray and the second statement, which was
 8 given by Mr. Gray in August?
 9   A.  What if any contact, how frequent the contact
10 was, I do not know.
11   Q.  Do you have an understanding of what if anything
12 he did in terms of the investigation during that time
13 period?
14   A.  Only with regard to all those gentlemen, my, I
15 can only tell you what they did not do.  There was no
16 follow up in any of these areas, but affirmatively, I
17 don't know what they did.
18   Q.  And do you know what if any steps -- strike
19 that.
20       What, if anything, did Trooper Newcomer do from
21 the time of the second statement given by Mr. Gray in
22 August until the time that he pled guilty?
23   A.  I only know what he did not do.  I do not know
24 what he did.
25   Q.  And do you have any -- strike that.
```

Everman & Everman, Inc.

PAGE 45

**45**

```
 1       What's your understanding of when Mr. Gray
 2 obtained an attorney?
 3   A.  I believe that he did not obtain an attorney in
 4 the person of Miss Christine Gutierrez until the eve of
 5 the trial.  Reportedly, he had very little contact, just
 6 a few minutes contact with her.
 7   Q.  Based upon what you have seen in the record, is
 8 there any indication that prior to the time that Mr. Gray
 9 appeared before Judge Rymer and pled guilty, that he
10 recanted either one of the statements that he made in
11 June or in August of 1991?
12   A.  I recall in the record of him recanting,
13 reportedly recanting over and over again to his attorney
14 that he did not do this and he was being intimidated and
15 her reported telling him you just need to stay with his
16 guilty plea.
17   Q.  But there's nothing in the record to suggest
18 that Mr. Gray recanted his two statements, one in June
19 and one in August, to either the sheriff's office for
20 Calvert county or the Maryland state police?
21     MR. KATZ:  You're talking about prior to the --
22     MR. KARPINSKI:  Prior to pleading guilty.  Thank
23   you, Mr. Katz.
24   A.  There's nothing in the record that reflects
25 anything in that regard.
```

Everman & Everman, Inc.

ANTHONY GRAY vs. STATE OF MARYLAND, et al.
Deposition of Dr. George Kirkham
August 7, 2003

SHEET 13   PAGE 46

**46**

1 I want to be sure I hit everything you were
2 asking me about. The handwriting exemplars were another
3 thing that at one point, I think it was Long, if I recall
4 correctly, said yeah, this is Gray's handwriting, I
5 recognize it, and of course, you'd never -- you know, I'm
6 not a handwriting expert, I'm sure you're not either --
7 you'd never accept a layperson's observation in that
8 regard. It would be cause to have the handwriting on the
9 checks, the stolen checks, checked against exemplars, and
10 of course, those were, those were ultimately shown to be
11 negative too. So there's just, there was not a scintilla
12 of evidence.
13 BY MR. KARPINSKI:
14   Q. Well, the checks selects were sent out to see
15 whether they would match.
16   A. Right, and also check for prints, and there were
17 no prints on them.
18   Q. And do you have an understanding of when the
19 handwriting, the checks were sent out and when there was
20 a determination made that there was not a match exemplar?
21   A. I don't recall when that was done without
22 checking the record, but again, these were all things
23 that could and should have been done expeditiously.
24   Q. Who could or should have done this? Who do you
25 contend should have done this?

PAGE 47

**47**

1   A. Well, we've identified -- I don't know, I'll say
2 Officer Newcomer, I don't think it is Deputy Newcomer --
3   Q. It's trooper. Mr. Katz was correct.
4   A. Trooper Newcomer as the self-identified lead
5 investigator. It would be his responsibility to make
6 certain that these basic steps were -- this is not
7 complicated stuff, I mean, this is basic police
8 investigative procedure -- these basic things were done,
9 fingerprints, fibers, DNA evidence, handwriting
10 exemplars, all of these things, alibi witnesses, none of
11 this was done, none.
12   Q. How about the fingerprint evidence, when was
13 that sent out for testing and when were the results
14 brought back?
15   A. Again, I don't know when it was sent out, but
16 there was abundance of time for all of these things to
17 have been done in an expedited fashion, and should have
18 been.
19   Q. Well, there were certain things that are
20 contained in your report, and I do want to talk about
21 them. For example, you say that there was exculpatory
22 evidence that would have shown that Gray was not
23 involved, and the first is hair evidence found on the
24 body of Mr. Pellicano that came from a white male.
25   A. Right, there was a, there was a hair follicle

PAGE 48

**48**

1 found in the pubic region of Mrs. Pellicano that was a,
2 was not a negroid hair follicle.
3   Q. But we know that means nothing, because the
4 person who actually did the rape was black.
5   A. Right.
6   Q. So that's a complete wash all the way around.
7 Correct?
8   A. Well, the point of it is, the significance of it
9 is, in the beginning when this investigation turned to
10 Mr. Gray and Mr. Long and Mr. Holland, there was no
11 evidence at all that the perpetrator was a black male.
12 To the contrary, there were fact witnesses who had
13 reportedly seen a white male driving her blue car from
14 the scene. So, there was never -- where did the, where
15 did the black suspect thing first originate from? I
16 don't know.
17   Q. But ultimately, a person who was
18 African-American had committed the crime. We know that.
19   A. Ultimately, that' true. Ultimately, and there
20 was a, there was a -- but the same DNA evidence that
21 matched that person excluded the other people as suspects
22 early on. How -- rhetorical question again -- how could
23 they possibly not act on that, not be aware of it? It's
24 inconceivable to me.
25   Q. Do you know when the DNA evidence, when the

PAGE 49

**49**

1 results came back?
2   A. Again, I don't know when they were submitted and
3 when they came back, but we're talking about a person's
4 life in the balance here. This stuff all should have
5 been done, and could have been done, this guy was locked
6 up for months with no attorney. This stuff could have
7 all been done quickly.
8   Q. And it is your testimony that the DNA evidence
9 would have expressly excluded Gray? In other words,
10 isn't it possible that Gray had participated in the rape
11 but not had not ejaculated, or there was simply no DNA,
12 the sample was not sufficient to have a DNA match?
13   A. Well, my recollection is, and again, there's a
14 lot of forensic stuff in the file that I don't have, but
15 my recollection is that sperm was find in the vaginal
16 vault and that the DNA from that sperm was identified
17 positively as being that of Anthony Fleming later on.
18 The absence of sperm from, from Mr. Gray would go then to
19 the question of would there -- and this is, I'm not a
20 criminalist and I can't answer this question for you, but
21 would there be other swab evidence in there of cells or
22 other trace evidence that would -- you're suggesting that
23 Mr. Gray, what, had intercourse with her and did not
24 ejaculate?
25   Q. Isn't that possible?

Everman & Everman, Inc.

D. Linda Minor, RPR
Everman & Everman, Inc.
1101 North Olive Avenue, West Palm Beach, Florida   33401