IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANTHONY GRAY           :

                                          :

    v.                           :         Civil No. CCB-02-0385

                                          :

STATE OF MARYLAND, et al.     :

                                          :

**MEMORANDUM**

      The defendants in this civil rights case have moved for summary judgment. (Docket nos. 53, 54.) Though the plaintiff, Anthony Gray, started out with eight counts, my ruling on a previous motion to dismiss whittled the complaint down to the following claims: (1) a state-law malicious prosecution claim against Calvert County, Maryland, plus three individual government officers, Maryland State Trooper Brian Newcomer, Maryland State Trooper Richard Sheldon, and Deputy Lawrence Stinnett (previously Sheriff of Calvert County) (Count I); (2) a claim under Article 24 of the Maryland Declaration of Rights against the same four defendants (Count IV); (3) a claim under 42 U.S.C. § 1983 against the three individual defendants (Count VII); (4) a bifurcated § 1983 claim against Calvert County (also Count VII); and (5) a claim under 42 U.S.C. § 1981 against those four defendants plus the State of Maryland (Count VIII). *See Gray v. Maryland*, 228 F. Supp. 2d 628, 634 (D. Md. 2002). Now it appears that the plaintiff wishes to withdraw the § 1981 claims (Pl.'s Opp'n at 13), as well as the two state law claims against Calvert County. (*Id.* at 25). He also appears to acknowledge that the individual defendants may be liable only in their personal capacities. (*Id.* at 13.) Thus, the case at present involves the following claims: (1) a state-law malicious prosecution claim against the three individual defendants in their personal capacities; (2) a claim under the Maryland Declaration of Rights

against the three individual defendants in their personal capacities;[1] (3) a § 1983 claim against the three individual defendants in their personal capacities; and (4) a bifurcated § 1983 claim against the county.[2] Based on the record before me, I will now grant the defendants' motion and enter judgment as to all these claims.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia*

---

[1] My earlier opinion erroneously stated that counts I, IV, and VIII would continue against defendants Sheldon and Newcomer in their official capacities.

[2] In the event he prevails on the merits, Mr. Gray also intends to seek attorneys' fees.

*Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## BACKGROUND

The claims in this case relate to the seven-and-a-half-year incarceration of the plaintiff, Anthony Gray, on apparently mistaken charges of rape and murder. Viewing the record in the light most favorable to Mr. Gray, as the court must, the facts appear as follows.

Mr. Gray, who is African-American, was born in Calvert County, Maryland and has lived there throughout his life excepting periods of incarceration. (*See* Gray Dep. at 11.)[3] Mr. Gray has limited intelligence; his I.Q. score is 79. *See Gray*, 228 F. Supp. 2d at 632. He was enrolled in "special education" courses until he was expelled from school after the eleventh grade due to excessive absences. (Gray Dep. at 11-12.)

On about May 13, 1991, 38-year-old Linda May Pellicano was brutally raped and murdered by an intruder in her Calvert County home. Suspicion fell on Mr. Gray because Leonard Long, a suspect held on other charges, indicated on June 19, 1991 that he believed handwriting on a check stolen from Ms. Pellicano was Mr. Gray's. (Tr. of Hr'g on 11/12/91 at 12-13, Calvert County Mot.

---

[3]Excerpts of Mr. Gray's Deposition are attached to the Plaintiff's Opposition as Exhibit 1, the State of Maryland's Motion as Exhibit A, and Calvert County's Motion as Exhibit H. For the sake of consistency, I will cite simply to "Gray Dep." regardless of which exhibit includes the quoted pages.

for Summ. J. Ex. F.)[4] The following day Paul Holland, a second suspect held on other charges, told police that he had seen Mr. Gray and Mr. Long in the vicinity of Ms. Pellicano's house and that they had told him they intended to "get some money out of the house and they wanted him to look out for them." (Tr. of Hr'g on 11/13/91 at 94-95, Calvert County Mot. for Summ. J. Ex. C.)  Mr. Holland stated that he watched Mr. Gray and Mr. Long proceed to the rear of Ms. Pellicano's house, but he then fled the area when he saw Ms. Pellicano's blue vehicle pull into the driveway. (*Id.* at 95.)  It is unclear who conducted the first of these two interviews, but the second was undertaken by Maryland State Trooper Brian Newcomer and then-Sheriff of Calvert County Lawrence Stinnett, both defendants in this case.  (*Id.* at 93-95.)  Trooper Newcomer was the lead investigator on the Pellicano case.  (Newcomer Dep. at 110.)[5]

At approximately 6:00 p.m. on June 20, 1991, Trooper Newcomer, accompanied by Sherriff Stinnett, took Mr. Gray into custody for questioning.  (*See* Stinnett Dep. at 33, 36, Calvert County Mot. for Summ. J. Ex. D.)  Though there was no arrest warrant, Trooper Newcomer has stated that he believed there was probable cause to make an arrest based on the two statements implicating Mr. Gray in the murder.  (Newcomer Dep. at 31-32, 40-41.)  At the state police barracks, Mr. Gray was questioned for approximately half an hour.  (Gray Dep. at 54; Stinnett Dep. at 33.)  The questioning then terminated while the police called for a polygraph examiner.  (Stinnett Dep. at 33.)  While the

---

[4] Counsel indicated at the hearing that a handwriting expert later failed to support Mr. Long's identification of Mr. Gray's handwriting.

[5] Different excerpts from Trooper Newcomer's deposition are, again, included as exhibits to the plaintiff's opposition (Ex. 4), Calvert County's motion (Ex. B), and the State of Maryland's motion (Ex. B). The deposition will be cited simply as "Newcomer Dep."

defendants contend that Trooper Newcomer advised Mr. Gray of his Miranda rights "when we first picked him up" (Stinnett Dep. at 45), Mr. Gray stated during his deposition, first, that he did not remember being advised of his rights and, later, that "[n]o" he was not advised of his rights (Gray Dep. at 69, 107). Mr. Gray also alleges that he asked repeatedly to call an attorney, or to call his family so that he could get an attorney, but that he was prevented from talking to anyone. (*Id.* at 105-06.) Mr. Gray also says he was given no food and prevented from sleeping during the night of June 20, 1991. (*Id.* at 108-09.)

Mr. Gray appears to have been questioned intermittently as the night went on. He remembers undergoing two polygraph examinations, each lasting about an hour, and being told afterwards that he had failed, though in fact the results were inconclusive. (*Id.* at 58-59.) In neither case was Sheriff Stinnett or Trooper Newcomer present for the examination. (*Id.* at 56-59.) After the polygraph tests, Mr. Gray was returned to his cell for approximately two hours. (*Id.* at 59.) Then, at some time after midnight, Sheriff Stinnett and two other officers (apparently Trooper Newcomer and Trooper Greg Cameron)[6] took Mr. Gray to an interview room for further questioning. According to Mr. Gray, the officers said they knew Mr. Gray had committed the crime because Mr. Long had told them so. (*Id.* at 62.) Sheriff Stinnett told Mr. Gray that if he didn't plead guilty he would "fry in the electric chair." (*Id.* at 63.)[7] After about 20 minutes, according to a report prepared by Trooper Cameron (Calvert County

---

[6]Trooper Cameron's report of the interrogation indicates that Trooper Cameron and Trooper Newcomer were present but makes no mention of Sheriff Stinnett. (Calvert County Mot. for Summ. J. Ex. I.)

[7]Sheriff Stinnett denies making such a statement. Trooper Cameron's report indicates that they "discussed the seriousness of the crime for which [Mr. Gray] was being questioned." (Calvert County Mot. for Summ. J. Ex. I.)

Mot. for Summ. J. Ex. I), Mr. Gray told the officers that he encountered Mr. Long and Mr. Holland on the day in question while on his way to buy crack cocaine. Long and Holland, Mr. Gray said, were planning to "break into a house" to "get some money." Mr. Gray then repeated the story, stating this time that he saw Long and Holland walk down "the driveway located next to the victim's house" before parting ways with them. Finally, telling the story for a third time, Mr. Gray stated, according to the police report, that he stood at a nearby intersection and watched for 15 or 20 minutes while Long and Holland went behind the victim's house. Mr. Gray said he left when he saw Ms. Pellicano return home in her "blue car."

      At approximately 4:00 am on June 21, 1991, following a break in the questioning, Mr. Gray gave a recorded statement in the company of Sheriff Stinnett and Trooper Newcomer. At the start of the recording, Trooper Newcomer asked Mr. Gray whether he had been advised of his rights and agreed to make a statement. Mr. Gray responded, "Yeah." (Tr. of 6/21/91 Statement at 1, Calvert County Mot. for Summ. J. Ex. K.) Mr. Gray then gave a statement similar to the third version of events described in the police report. He indicated that he encountered Long and Holland on the street and they asked him to "watch out" for them while they got money from Ms. Pellicano's house. Mr. Gray said he saw Ms. Pellicano's blue car pull up 15 or 20 minutes later, at which time he left. (*Id.* at 1-2.) Only later, Mr. Gray said, did he hear that "a lady had got killed." (*Id.* at 3.) In an affidavit dated January 21, 2004, Mr. Gray maintains that this taped statement was false. "Stinnett and Newcomer," he says, "were telling me that Paul Holland and Leonard Long were saying that I did the crime so I lied

6

and said they did the crime. I gave the statement on June 21, 1991 because I was scared. I really did not know anything about who did the crime." (Gray Aff. ¶ 6, Pl.'s Opp'n Ex. 7.)[8]

After giving the taped statement, Mr. Gray was transported to the Calvert County detention center where he was held without further contact with Sheriff Stinnett or Trooper Newcomer until August 6, 1991.[9] (Gray Dep. at 76.) On that day, Mr. Gray gave a second recorded statement, this time in the company of Trooper Newcomer and Trooper Richard Sheldon, the third individual defendant in this case. Though Mr. Gray believes the interview took place at the sheriff's office (*id.*), Sheriff Stinnett was not present (Stinnett Dep. at 48). As with the first recorded statement, the officers began the interview by having Mr. Gray acknowledge that he had been informed previously of his rights and waived them. In addition, referring to a signed waiver of rights, Trooper Sheldon reviewed the specific rights Mr. Gray already had waived and had Mr. Gray reaffirm the waiver as to each one. (Tr. of 8/6/91 Statement at 1-2, Calvert County Mot. for Summ. J. Ex. L.) As with the prior interrogation, Mr. Gray says he requested a lawyer, but Newcomer and Sheldon "would not let [him] talk to an attorney." (Gray Aff. ¶ 7.)[10] He says the two officers "kept telling me to remember what Stinnett told me would happen to me if I did not confess." (*Id.* ¶ 8.) "They told me," Mr. Gray claims, "the details

---

[8] Earlier, however, at his deposition on March 24, 2003, Mr. Gray specifically attributed his confession to the officers' references to the electric chair. When asked about his "purpose in giving the statement," Mr. Gray responded, "They telling me [*sic*] I was going to get the electric chair. So I had to do something. Why should I die for something that I didn't do?" (Gray Dep. at 123-24.)

[9] Indeed there is no indication of any contact between Mr. Gray and Sheriff Stinnett after June 20 or 21, 1991.

[10] This statement conflicts with the recorded conversation in which he is specifically advised of his right to counsel and nevertheless chooses to answer questions. (Tr. of 8/6/91 Statement at 1-2, Calvert County Mot. for Summ. J. Ex. L.)

of the crime and what to say in my statement." (*Id.* ¶ 9.) During the recording, according to Mr. Gray, Sheldon and Newcomer "turned the tape recorder off and on many times in order to tell me what to say so I would get it right." (*Id.*)

In the August 6, 1991 statement, Mr. Gray confessed to broader participation in the crime. In this new version of events, Mr. Gray stated that he went to Ms. Pellicano's house with Holland and Long, and watched while Holland "popped" a screen window out with a screwdriver and threw it in the woods behind the house. (Tr. of 8/6/91 Statement at 3.) The three suspects then entered the house through the window in a child's bedroom and searched, Mr. Gray said, "through things, drawers, underneath the bed, in the closet." (*Id.* at 4.) While they were searching, Mr. Gray saw Ms. Pellicano's car pull up. He "hollered" to the others, and Mr. Holland hid behind a door while Mr. Gray and Mr. Long hid behind the couch. (*Id.* at 5.) As Ms. Pellicano entered, Mr. Holland grabbed her by the neck. Ms. Pellicano started "yelling, please don't hurt me, please don't hurt me," while Mr. Long went to the kitchen and retrieved a butcher knife that Mr. Holland used to stab her in the chest. (*Id.* at 6-7.) Ms. Pellicano fell to the floor, and after her body stopped "shaking," Mr. Holland raped her. (*Id.* at 8-11.) Afterwards, according to Mr. Gray, Mr. Holland tied up Ms. Pellicano (*id.* at 11) and turned on the gas stove in an effort to burn down the house (*id.* at 20-21). The three men then left in Ms. Pellicano's car, Mr. Gray said, taking several stolen checks with them. (*Id.* at 12-14.)

Mr. Gray's August 6th statement appears inconsistent in several respects with the physical evidence recovered at Ms. Pellicano's home. Whereas Mr. Gray said the window screen was thrown to the ground, the police report describing the crime scene notes that "[t]he screen appeared to be folded and placed in that area [the woods behind the house] as opposed to being just dropped on the

8

ground." (Crime Scene Report, Pl.'s Opp'n Ex. 9.) Mr. Gray also describes rummaging through "the boy's bedroom" (Tr. of 8/6/91 Statement at 4), though the police report indicates that "the victim's son's room was very undisturbed" (Crime Scene Report). The stove in the Pellicano home was electric, whereas Mr. Gray recalled leaving the gas on, and two knives were found at the scene, as opposed to the one Mr. Gray described. In addition, though Mr. Gray stated, in response to a specific question on the issue, "I didn't see [Mr. Holland] put anything around [the victim's] face" (Tr. of 8/6/91 Statement at 8), the police report indicates that Ms. Pellicano was found with a plastic bag around her head and that, in addition, some pantyhose appeared to have been tied around her neck, a necktie used to blindfold her, a telephone cord tied around her neck, and a sock stuffed in her mouth as a gag (Crime Scene Report).[11] No physical evidence connected Mr. Gray to the crime.

On June 21, 1991, following Mr. Gray's first taped confession, Trooper Newcomer filed a Statement of Charges accusing Mr. Gray of murder, rape, and breaking and entering. (Statement of Charges, Calvert County Mot. for Summ. J. Ex. G.) As evidence of probable cause, Trooper Newcomer cited the statements by Holland and Long, as well as evidence that Mr. Gray had been stopped at a roadblock the day after the crime and admitted being in the area the day before. He also included Mr. Gray's June 21, 1991 statement that he served as a "lookout" for Holland and Long and "walk[ed] down the roadway . . . towards the victim's residence" after the two men told him they

---

[11] Mr. Gray did state that he saw Mr. Holland tie "a rope like" around Ms. Pellicano's neck and also use "string or rope or something" to tie her hands behind her back. (Tr. of 8/6/91 Statement at 8, 11).

9

intended to "get some money" from Ms. Pellicano's house. (*Id.*) Mr. Gray was detained based on those charges.

Counsel entered an appearance for Mr. Gray on August 27, 1991 and filed motions. (*See* Gray Docket Sheet, State of Md. Mot. for Summ. J. Ex. F.) On October 7, 1991, after thorough questioning by the state judge, Mr. Gray pleaded guilty to charges of rape and murder. At the plea hearing, he endorsed a statement of facts very similar to his statement on August 6. (Tr. of Hr'g on 10/7/91 at 8-10, Calvert County Mot. for Summ. J. Ex. N.)[12] He was sentenced to life in prison with the possibility of parole after 30 years. (Gray Docket Sheet; Am. Compl. ¶ 37.)[13] Mr. Holland and Mr. Long also were charged, but the case against Mr. Long was dismissed after the government's evidence and Mr. Holland's trial ended in an acquittal. (*Id.* ¶ 38.)

Some six years later, another group of Maryland police interviewed another individual, Anthony Fleming, and identified him as a suspect in the Pellicano murder. DNA evidence connected Mr. Fleming to the crime, leading to his conviction. (Newcomer Dep. at 103-05.) Though the State's Attorney apparently had received a letter from Mr. Fleming sometime in 1991 indicating that he had information about the murder, Trooper Newcomer made no effort to follow up on the letter, other than discussing it with the prosecutor. (*Id.* at 103-04.)[14] On February 8, 1999, a Maryland Circuit Court

---

[12] Mr. Gray also agreed to testify against Mr. Holland and Mr. Long, but I was advised at the hearing that he did not do so.

[13] Mr. Gray was not facing the death penalty. The State withdrew its notice of intention to seek life without parole as part of the plea agreement. (Tr. of Hr'g on 10/7/91 at 13, 15).

[14] Neither the letter itself nor its specific contents are in the record.

granted Mr. Gray a new trial. The state declined to retry Mr. Gray, bringing about his immediate release.

### ANALYSIS

A central issue bearing on all Mr. Gray's remaining claims is whether the police acted with probable cause. As I explained in my previous ruling, Mr. Gray's only intact theory of relief under § 1983 is that his seizure and confinement, at least during the period prior to his initial appearance, violated the Fourth and Fourteenth Amendments because it was not supported by probable cause. This is in the nature of a malicious prosecution theory; he may not recover on a theory of false arrest under the Fourth Amendment because that claim is time barred. *See Gray*, 228 F. Supp. 2d at 637 (citing *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183-84 (4th Cir. 1996)). Because the search and seizure protections under the Maryland Declaration of Rights are identical to those in the federal constitution, *see Gray*, 228 F. Supp. 2d at 638 n.5 (citing *Widgeon v. E. Shore Hosp. Ctr.*, 479 A.2d 921, 927-28 (Md. 1984)); *Williams v. Prince George's County*, 685 A.2d 884, 895 (Md. Ct. Spec. App. 1996), this theory is also Mr. Gray's only grounds for recovery under the Maryland state constitution. Mr. Gray's state-law malicious prosecution claim relates to a broader time frame, but this tort, too, requires absence of probable cause as a necessary element, as well as malice or improper purpose on the part of the defendants. *See, e.g.*, *Candelero v. Cole*, 831 A.2d 495, 500 (Md. Ct. Spec. App. 2003); *Montgomery Ward v. Wilson*, 664 A.2d 916, 922 (Md. 1995).

First, regarding the § 1983 claim, the record shows that Trooper Newcomer took Mr. Gray into custody on June 20, 1991, and then filed a statement of charges, including murder, rape, and breaking into the Pellicano residence with intent to commit a felony by taking away property having a

value of $300 or more (Statement of Charges, Calvert County Mot. for Summ. J. Ex. G).  Setting aside Mr. Gray's statement, the evidence relied on by Trooper Newcomer was nonetheless sufficient to establish probable cause at the time Mr. Gray was seized.  On June 19 and 20, 1991, two suspects had given statements implicating Mr. Gray in the crime:  Mr. Long identified Mr. Gray's handwriting on a check stolen from Ms. Pellicano's home, and Mr. Holland stated that Mr. Gray and Mr. Long asked him to be a lookout while they attempted to burgle Ms. Pellicano's house at about the time when the murder occurred.  In addition, according to Trooper Newcomer's Statement of Charges, Mr. Gray was stopped at a roadblock in front of the crime scene on the day after the murder and admitted to having been in the area the day before.  Even if Mr. Gray's confession on June 21, 1991 was coerced—a matter about which the court expresses no opinion—this other evidence was "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect [had] committed . . . an offense," as the probable cause standard requires.  *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)); *see also Dutton v. Montgomery County*, 94 F. Supp. 2d 663, 665 (D. Md.) (dismissing § 1983 claim where probable cause to arrest was based on two witness statements that the plaintiff had not shown the defendant officer knew were false), *aff'd*, 232 F.3d 887 (4th Cir. 2000) (unpublished table disposition); *cf. United States v. Williams*, 10 F.3d 1070, 1076 (4th Cir. 1993) ("A combination of tips from an informant and first-hand corroborative observation of suspicious activity will provide probable cause for an arrest." (internal quotations omitted)).

     In any event, the facts were sufficient that a reasonable officer in Newcomer's (or Stinnett's) position as of June 20, 1991 could have reasonably believed there was probable cause, thus

establishing a defense of qualified immunity. *See Taylor v. Waters*, 81 F.3d 429, 435 (4th Cir. 1996). Thus, Mr. Gray has failed to present facts sufficient to establish a Fourth Amendment violation based on the June 1991 seizure prior to his initial appearance.[15]  Nor can any Fourteenth Amendment claim be sustained. *Id.* at 437. His § 1983 claim must be dismissed as to all defendants. *See Edwards v. Pretsch*, 180 F.Supp.2d 499, 507-08 (D.N.Y. 2002).

Although the § 1983 claim was the sole remaining basis for federal jurisdiction, the substantial time and resources the court has devoted already to this case persuade me to maintain supplemental jurisdiction over the remaining state-law claims, as I have discretion to do under 28 U.S.C. § 1367. *See generally Shanaghan v. Cahill*, 58 F.3d 106, 109-10 (4th Cir. 1995). Judgment also will be entered for the defendants as to these claims. Count IV, the Maryland Declaration of Rights claim, is deficient for the same reasons as Count I: if Mr. Gray cannot establish a Fourth or Fourteenth Amendment violation, it follows that he cannot establish a violation of Article 24 of the Maryland Declaration of Rights, as the scope of that provision is identical to the Fourteenth Amendment Due Process Clause. *See Gray*, 228 F. Supp. 2d at 638 n.5. As for the malicious prosecution count, this claim may cover events occurring after the initial appearance, but Mr. Gray cannot satisfy all the necessary elements.

---

[15] The Commissioner found probable cause to detain Mr. Gray only on Count I, the murder charge. (State of Maryland Mot. for Summ. J., Ex. B-1)  This appears to reflect a decision concerning release or detention, rather than the adequacy of the evidence submitted by Newcomer. An objective review of the Statement of Charges demonstrates that the breaking and entering charge was at least as well supported as the murder charge.

Maryland's tort of malicious prosecution has four elements: "(a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'malice,' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Wilson*, 664 A.2d at 922 (internal quotations omitted). As concerns the probable cause element, "[t]he conviction of the accused by a magistrate or trial court although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means." *Zablonsky v. Perkins*, 187 A.2d 314, 316 (Md. 1963) (quoting Restatement (First) of Torts § 667 (1938)); *see also Quecedo v. DeVries*, 321 A.2d 785, 791 (Md. Ct. Spec. App. 1974) (rejecting a malicious prosecution claim although the defendant was found not guilty in a de novo trial because his initial conviction "represents a conclusive determination of the existence of probable cause for the institution of the charge"); Restatement (Second) of Torts § 667 (1977).[16] Apparently conceding that this rule may apply despite the order for a new trial in his case, Mr. Gray argues that his conviction is not conclusive evidence of probable cause because it falls within the exception for "fraud, perjury or other corrupt means." His argument is that the defendants extracted his confessions and his guilty plea by means of improper conduct, including threats that he would "fry," questioning without Miranda warnings, disregard for requests for counsel, unreasonable conditions of confinement, and exploitation of Mr. Gray's low intelligence. *Cf. Montgomery v. De Simone, PTL*, 159 F.3d 120, 125

---

[16]The Fourth Circuit recently acknowledged these principles of Maryland law in an unpublished opinion. *See Asuncion v. City of Gaithersburg*, 73 F.3d 356, 1996 WL 1842, at *2 (4th Cir. 1996) (unpublished table disposition).

(3d Cir. 1998) (holding that "the Restatement's rule that an overturned municipal conviction presumptively establish [*sic*] probable cause contravenes the policies underlying the Civil Rights Act and therefore does not apply to a section 1983 malicious prosecution action").

Mr. Gray, however, has failed to proffer evidence sufficient to show that his decision to plead guilty, which establishes probable cause, was coerced or otherwise caused by the defendants' improper conduct. At the time of the plea, he had been represented by counsel for more than a month. He was not facing the death penalty. Under careful questioning by the state judge, he admitted the truth of the factual proffer, appeared to understand the consequences of his plea, and even indicated a willingness to testify against his co-defendants. Mr. Gray's complaints about the ineffective assistance of his defense counsel cannot be used to attribute liability to the defendants.

In summary, while later events proved the prosecution mistaken, and Mr. Gray most unfortunately was jailed for a crime he did not commit, he cannot establish liability against these defendants under the applicable standards. Nor can he prevail on his § 1983 claim against Calvert County because success on that claim requires proof of a civil rights violation by one of the other defendants. Accordingly, judgment will be entered in favor of the defendants on all claims.

A separate Order follows.

| September 24, 2004 | /s/ |
| Date | Catherine C. Blake |
|  | United States District Judge |